**Kevin P. HIGGINS, et al.**

v.

**E.I. DuPONT de NEMOURS & CO., INC. et al.**

**Civil Nos. S 85–4896, S 87–1108.**

United States District Court, D. Maryland.

July 28, 1987.

---

**8.** Defendant's Answer filed November 10, 1986, p. 2.

**9.** *See* n. 5, *supra.*

Alex S. Katzenberg, Cohen, Snyder, McClellan, Eisenberg, P.A., James M. Gabler, Phillips P. O'Shaughnessy, Allison D.

Kohler, Sandbower, Gabler & O'Shaughnessy, P.A., Baltimore, Md., for plaintiffs.

William E. Gordon, Jr., Wilmington, Del., Jervis S. Finney, Pamela J. White, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendant DuPont.

James E. Gray, William J. Jackson, Semmes, Bowen & Semmes, Baltimore, Md., for defendant Union Carbide.

Deborah E. Jennings, Baltimore, Md., for defendant Eastman.

SMALKIN, District Judge.

### I.

This is a products liability action, resting on diversity jurisdiction, involving claims of negligence, strict liability, and warranty, all arising from the defendants' alleged failure to warn of possible teratogenic[1] effects of Imron paint. The remaining plaintiffs[2] are Kevin Higgins, Ronald Jones, and Mary Williams. Mr. Higgins fathered twins who died at birth. Mr. Jones and Ms. Williams were parents of twins who also died at birth. Mr. Higgins and Mr. Jones assert survival claims as personal representatives of the estates of their deceased children. Mr. Jones and Ms. Williams additionally assert wrongful death claims.

Both Mr. Higgins and Mr. Jones were fire fighters with the Baltimore City Fire Department, specifically Engine Company Number 1. The Baltimore City Fire Department purchased Imron polyurethane enamel, thinner, and activator (collectively, Imron paint) from DuPont, which manufactures these products using, *inter alia*, glycol ether acetates supplied by Eastman and Union Carbide. Plaintiffs and defendants alike have produced a plethora of material evidencing DuPont's knowledge of the possible teratogenic effects of glycol either acetates as early as 1980. As stated by plaintiffs in their complaint, the Baltimore City Fire Department had "distributed the Imron paint to the fire stations throughout the City, including Engine No. 1 ... in

---

1. A teratogen is a compound that can cause birth defects, fetal death, or stillbirth.

2. Several other plaintiffs have been dismissed on limitations grounds.

unmarked cans without labels, warnings or instructions." Paper # 1, at 12. Messrs. Higgins and Jones applied Imron paint to the fire fighting apparatus at their station, which is not a paint shop, but an ordinary firehouse. Union Carbide's motion for summary judgment best states the gravamen of plaintiffs' complaint: "According to the plaintiffs, by virtue of the use of the Imron paint by Higgins and Jones, but through unspecified mechanisms, the fetal development of the Higgins and Jones twins was somehow adversely affected by toxic properties of the glycol ether components of the Imron paint." Paper # 38, at 9.

The Court now addresses a number of motions filed by defendants Eastman and Union Carbide only. The Court first addresses the motion for summary judgment filed by Eastman, Paper # 39, and so much of the motion for summary judgment filed by Union Carbide, Paper # 38, at 8–28, as is based on a sophisticated user/bulk supplier defense. The plaintiffs have filed their opposition thereto. Paper # 47. The Court will also address the second motion for summary judgment filed by Eastman, Paper # 42, and so much of the motion for summary judgment filed by Union Carbide, Paper # 38, at 4–8, as is based on limitations. (While plaintiffs have timely opposed defendant DuPont's motion for summary judgment based on limitations grounds, they have not opposed the similarly-based Eastman and Union Carbide motions.) Finally, the Court will address the separate motions for protective order filed by Eastman and Union Carbide, Paper # 45 and Paper # 49 respectively, and plaintiffs' oppositions thereto, on Papers # 48 and # 46, respectively.

## II.

Both Eastman and Union Carbide have moved for summary judgment based essentially on the sophisticated user/bulk supplier doctrine. Specifically, Eastman moves for summary judgment "because there is no genuine dispute of material fact that Eastman was a bulk supplier of a constituent chemical [of Imron] to a sophisticated manufacturer, E.I. DuPont de Nemours,

Inc." Paper # 39, Motion at 1. Eastman explains its position in its Memorandum: "Eastman is entitled to judgment as a matter of law because (1) Eastman provided ample warnings to DuPont, the manufacturer of Imron paint; and (2) as a bulk supplier of a constituent component to a sophisticated user, Eastman had no duty to provide warnings to Plaintiffs." *Id.*, Memorandum at 2. Union Carbide similarly asserts that it "is entitled to judgment as to all claims because it was a bulk supplier of an unpatented, commodity chemical to DuPont, a sophisticated user; DuPont incorporated the chemical along with other ingredients into a proprietary formulation known as Imron, which it marketed in its own packaging and labeling; Union Carbide warned DuPont of suspected potential reproductive hazards well in advance of the conceptions of the infant plaintiffs; DuPont acquired full knowledge and awareness of those hazards from Union Carbide, various other sources [including Eastman], and its own Haskell Laboratory; and Union Carbide can thus not be held liable under any product liability theory to ultimate users of DuPont's product, whose identities were unknown and unknowable to Union Carbide." Paper # 38, at 2–3. Plaintiffs oppose both the Eastman and Union Carbide motions for summary judgment, stating:

[They] should be denied outright because their bulk supplier/sophisticated user defense is not material to Section 402A claims. To the extent that the defense does apply to plaintiffs' claims in negligence, movants have failed to show a clear danger, an adequate warning, or reasonable reliance by them upon DuPont, all elements of defense. Because factual matters are at the core of the asserted defense, discovery should be allowed to pursue the topics identified in plaintiffs' papers.

Paper # 47, at 3–4. Despite the aggregate treatment of the claims by the parties, the Court will address the negligence and strict liability claims jointly, and the warranty claim independently thereafter. No oral

hearing is necessary to decide this matter. Local Rule 6(G), D.Md.

### A.

■ Movants' legal position is that, as bulk suppliers of commodity chemicals to a sophisticated chemical and coatings company (DuPont), they had no duty to warn any DuPont customer (much less a customer's employees), of any possible teratogenic effects of the commodity chemicals or the product in which they were incorporated. Plaintiffs claim that the defendants Eastman and Union Carbide have not shown that this defense precludes their negligence claims and that the defense is not "material" to the strict liability claims.

In *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985), the United States District Court for the Western District of Virginia recognized the availability of a sophisticated user/bulk supplier defense in a negligent failure to warn claim, asserted under *Restatement (Second) Torts* § 388 (1965). *Goodbar* involved three diversity actions asserting negligence, strict liability, and warranty claims. 591 F.Supp. at 554. Specifically, some 132 present and former employees of the Lynchburg Foundry brought suit against 12 defendants who had supplied silica sand to the Foundry. *Id.* The sand was supplied unpackaged in railroad car lots, which were emptied onto conveyor belts or pneumatic transporters, where the material was conveyed to large tanks or silos for storage, ultimately to be used in various stages of metal castings production. *Id.* at 554–55. The suppliers in *Goodbar* were accused of "fail[ing] to advise the Foundry's employees with respect to the dangerous characteristics of silica products and how to protect themselves from them," resulting in the employees' exposure to silica and their eventual illness with silicosis. *Id.* at 555.

In *Goodbar*, Judge Kiser noted that Virginia had not adopted § 402A strict liability, and that the focus therefore was on negligent failure to warn and breach of the implied warranty of merchantability. *Id.* With respect to the negligent failure to warn claim, Judge Kiser employed the analysis suggested by Restatement § 388. Judge Kiser began by stating that the matter before him turned "upon whether the requirements of clause (c) [of § 388] have been met, namely whether the Defendants failed to exercise reasonable care in relying upon the Foundry to supply its employees with the necessary information to satisfy the duty to warn." *Id.* at 557. Judge Kiser thereafter looked to comment *n* of § 388, entitled "Warnings given to third person," which delineates factors that must be balanced in determining what precautions the supplier must take to satisfy the clause (c) requirement of reasonable care including

(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burden imposed on the supplier by requiring that he directly warn all users.

*Id.* at 557. Comment *n* to § 388, according to Judge Kiser, "recognizes that a balancing of these considerations is necessary in light of the fact that no single set of rules could possibly be advanced that would automatically cover all situations." *Id.* Judge Kiser stated: "Critical in my view is the recognition that '[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so.'" *Id.* (quoting in part § 388 comment *n* at 308).

On the basis of § 388 and comment *n* thereto, Judge Kiser recognized the sophisticated user/bulk supplier defense, holding that "there is no duty on product suppliers to warn employees of knowledgeable industrial purchasers as to product-related hazards." *Id.* at 559. Finding "that a plethora of material exists on the Lynchburg Foundry's extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis and proper dust control methods," Judge Kiser granted the defendant suppliers' motion for summary judgment regard-

ing the sophisticated user/bulk supplier defense on the § 388 negligent failure to warn claim. *Id.* at 561–62. Judge Kiser additionally noted that the defendant suppliers had no duty to warn Foundry employees, given that the Foundry was the only one in a position to communicate an effective warning to its employees. *Id.* at 566. The Court then listed a number of difficulties faced by the suppliers in trying to warn Foundry employees of silicosis, including "(1) the identification of the users or those exposed to its products would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force; (2) the manner in which the sand products are delivered in bulk (i.e. unpackaged railroad car lots or truck); (3) no written product warnings placed on the railroad cars would ever reach the workers involved in casting or those in the immediate vicinity due to the way the loose sand is unloaded, conveyed, and kept in storage bins until needed; (4) only the Foundry itself would be in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systematic basis necessary to reduce the risk of silicosis; (5) the sand suppliers must rely on the Foundry to convey any safety information to its employees; (6) the confusion arising when twelve different suppliers and the Foundry each try to cope with the awesome task of instructing the Foundry workers; and (7) in a commercial setting, it would be totally unrealistic to assume that the suppliers would be able to exert pressure on a large, industrial customer such as the Foundry to allow the suppliers to come in and educate its workers about the hazards of silicosis." *Id.* (citations omitted).

In the absence of any controlling Maryland decision, this Court is confident that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense in a negligent failure to warn case. *See Wilson v. Ford Motor Co.,* 656 F.2d 960 (4th Cir.1981). The Court of Appeals of Maryland has clearly adopted § 388 as an authoritative statement of the general principles regarding negligent failure to warn in Maryland. *See Moran v.*

*Faberge, Inc.,* 273 Md. 538, 544, 332 A.2d 11, 15 (1975) (citing *Twombley v. Fuller Brush Co.,* 221 Md. 476, 158 A.2d 110 (1960) and *Katz v. Arundel-Brooks Concrete Corp.,* 220 Md. 200, 151 A.2d 731 (1959)). The recognition of the sophisticated user/bulk supplier defense logically follows from the sense of § 388, as clearly pointed out by Judge Kiser in *Goodbar,* and as recognized by the Fourth Circuit.

This Court is similarly confident that the Court of Appeals of Maryland would also recognize the sophisticated user/bulk supplier defense in a failure to warn claim asserted on the ground of strict liability under *Restatement (Second) Torts* § 402A (1965). The parties have not cited, nor has the Court independently discovered, a Maryland case recognizing any doctrinal distinction between § 388 negligent, and § 402A strict liability, failure to warn cases. There are, however, diversity cases decided by this Court and the Fourth Circuit, under Maryland substantive law, *see Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that address whether there is any such difference. In the absence of a controlling Maryland case, this Court will follow those cases. In the leading one, the Fourth Circuit stated:

> The elements of both [negligence and strict liability] are the same with the exception that in negligence plaintiff must show a breach of duty of due care by defendant while in strict liability plaintiff must show the product was unreasonably dangerous. The distinction between negligence and strict liability lessens considerably in failure to warn cases. Under a negligence theory the issue is whether the defendant exercised due care in formulating and updating the warning, while under a strict liability theory the issue is whether the lack of a proper warning made the product unreasonably dangerous. Though phrased differently the issue under either theory is essentially the same: Was the warning adequate?

*Werner v. Upjohn Co., Inc.,* 628 F.2d 848, 858 (4th Cir.1980), *citing Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377, 381 (D.Md.

1975), *aff'd*, 567 F.2d 269 (4th Cir.1977); *Smith v. E.R. Squibb & Sons, Inc.*, 273 N.E.2d 476, 480 (Mich.1979); W.L. Prosser, *Torts* § 99, at 659 n. 73 (4th ed. 1971). *See also Weinberger v. Bristol-Myers Co.*, 652 F.Supp. 187, 191–92 (D.Md.1986). The latest edition of the venerable Prosser work on torts states, with respect to failure to warn, that:

> It is commonly said that a product can be defective in the kind of way that makes it unreasonably dangerous by failing to warn or failing adequately to warn about a risk or hazard related to the way a product is designed. But notwithstanding what a few courts have said, a claimant who seeks recovery on this basis must according to the generally accepted view, prove the manufacturer-designer was negligent. There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. *Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition, subject, however, only to the defenses and other limitations or liability applicable to strict liability rather than negligence.*

W.L. Prosser and W.P. Keaton, *Torts* § 99, at 697 (5th ed. 1984) (emphasis supplied). It therefore appears clear that, in failure to warn cases, whether asserted on negligence or strict liability grounds, there is but one unitary theory of liability which is negligence based—the duty to use reasonable care in promulgating a warning. It logically follows, then, that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense in any failure to warn claim.[3]

In addition to the fact that the authorities reviewed above have concluded that the standards for negligent and strict liability failure to warn are essentially the same, this Court independently finds nothing about failure to warn in the context of strict liability that is inconsistent with the principles encompassed in comment *n* to § 388. Quite simply, both negligent and strict liability failure to warn involve the same questions of scope of duty and causation: (1) To what extent did the supplier act reasonably in communicating or failing to communicate a warning? (2) Given information provided by a supplier, was the failure of a sophisticated user to communicate an effective warning to an employee or other ultimate user an intervening cause of injury? As Prosser points out, it is really only the immunity of strict liability to negligence-based defenses (like contributory negligence) that distinguishes strict liability from negligence in failure to warn cases. This distinction does not militate against making the sophisticated user/bulk supplier defense available in a § 402A strict liability failure to warn claim.

**B.**

■ Having determined that the Court of Appeals of Maryland would recognize

---

**3.** Plaintiffs submit that courts in "nearby states" have rejected the sophisticated user/bulk supplier defense to failure to warn claims brought under § 402A. Paper # 46, at 3–4, (citing *Brown v. Caterpillar Tractor Co.*, 741 F.2d 656, 660 (3rd Cir.1984); *Menna v. Johns-Manville Corp.*, 585 F.Supp. 1178, 1184 (D.N.J.1984), *aff'd*, 772 F.2d 895 (3rd Cir.1985); *Olencki v. Mead Chemical Co.*, 209 N.J.Super. 456, 507 A.2d 803, 806 (1986); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357, 368 (E.D.Pa.1982), *aff'd, sub. nom Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3rd Cir.1985). While decisions of the federal courts in other circuits might be persuasive in the absence of authority within the Fourth Circuit, this Court is not bound by such decisions. Rather, the cited decisions of the Fourth Circuit and the district courts therein accurately state Maryland law on the point, and Maryland law controls in this diversity case. The Court notes additionally that, contrary to plaintiffs' assertion, the Fourth Circuit did not reject the sophisticated user/bulk supplier defense in *Oman v. Johns-Manville Corp.*, 764 F.2d 224 (4th Cir.), *cert. denied*, 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985). Rather, the Fourth Circuit simply held in *Oman* that the facts did not give rise to the sophisticated user/bulk supplier defense.

the sophisticated user/bulk supplier defense to both negligent and strict liability failure to warn claims, this Court now addresses whether Eastman and Union Carbide are entitled to prevail, as a matter of law, on this defense against plaintiffs' failure to warn claims. It is worthwhile to restate the essential premise of this defense: There is no duty on product suppliers to warn ultimate users (whether employees or customers) of product-related hazards in products supplied in bulk to a knowledgeable user.[4] The corollary, of course, is that this is especially the case when the knowledgeable industrial purchaser is the only one in a position to communicate an effective warning to the ultimate user. It is clear from the "plethora of material" before this Court that the possible teratogenic effects of the chemicals were equally within the technical knowledge of DuPont, a very knowledgeable industrial purchaser of the constituent chemicals for its Imron paint, and Eastman and Union Carbide, the suppliers of said chemicals.[5] DuPont acquired its knowledge of the possible teratogenic effects of the chemicals known collectively as glycol ether acetates through independent inquiry, as well as from various outside sources including Eastman and Union Carbide. As stated by the plaintiffs themselves, "DuPont was aware of the possible teratogenic effects of the glycol ether acetates used by it in Imron paint as early as 1980, see Exhibit 5." Paper # 40, at 13. By way of Exhibit 5, Paper No. 40, a DuPont consultant for industrial hygiene noted that he, together with co-workers, had reviewed a Japanese paper entitled "Testicular Atrophy of Mice Induced by Ethylene Glycol Monoalkyl Ethers," and that they concurred in the following findings:

(1) repeated oral administration of high doses of ethylene glycol monalkyl ethers

produces toxic effects on the testes and hematological system in mice, (2) that these effects are dose dependent, (3) ethylene glycol at similar doses did not produce these effects, and (4) a no-observed effect level was obtained for each of the compounds which produced injury.

A DuPont memorandum dated April 23, 1981 makes clear that DuPont at that early date had within its possession reports regarding teratogenicity prepared by Japanese researchers, Dow Chemical, and the National Institute for Occupational Safety and Health (NIOSH). Those reports would be promptly evaluated by DuPont's own Haskell Laboratory. *Id.*, Exhibit 2. More information on the possible teratogenic effects of glycol ether acetates came to DuPont in the ensuing years. *Id.*, Exhibits 4–9. Plaintiffs represent that, in February of 1983, "DuPont received notice from Union Carbide that Union Carbide was changing the labels of cellosolve acetate (which was Union Carbide's trademark name for glycol ether acetate) such that Union Carbide's label would warn of possible teratogenic effects, and that Union Carbide was also revising its material safety sheets." *Id.* at 17 (citing Exhibits 2 and 9). The exhibits submitted by Union Carbide show additional communications by it and other companies regarding the possible teratogenic effects of the glycol ether acetates to DuPont. Paper # 38. For example, "Union Carbide sent to its customers, including DuPont, a notice dated March 11, 1981, advising of findings related to animal testicular changes, male infertility, and other results of high exposure animal testing," urging its customers to inform employees and ultimate users of the reported findings. *Id.* at 13 (citing Exhibit 3). By letter dated June 9, 1981, Eastman conveyed similar information to DuPont. *Id.*, Exhibit 4. Updated communications from these chemi-

---

4. Plaintiffs argue against reliance on *Goodbar*, stating that the sophisticated user/bulk supplier defense should not be expanded beyond cases of employee plaintiffs. Paper # 46, at 9–10. The Court does not find plaintiffs' position logically compelling. If anything, the bulk supplier would face an even more impossible task in communicating a warning to true consumers, *viz.*, those not in its customer's employ.

5. Contrary to plaintiffs' assertion, no additional factual discovery is necessary to resolve the instant motion. The present summary judgment motion is plainly adequate to put all relevant facts before the Court, and additional discovery would be pointless.

cal suppliers and others continued to be received by DuPont in the ensuing years. *See Id.* at 14–16. The Court agrees with defendant Union Carbide that "[n]umerous DuPont documents, ... already produced by DuPont to the plaintiffs via discovery, clearly illustrate DuPont's awareness of and various of its responses to the new information." *Id.* at 16. *See also Id.,* Exhibits 10–14. Indeed, the Haskell Laboratory, using the "plethora of materials" before it as a starting point, engaged in research on the teratogenic effects of the glycol ether acetates included in the blend which is marketed as Imron paint. It thus appears to this Court that, since 1980, DuPont has been privy to possession of the full range of knowledge available regarding the possible teratogenic effects of the glycol ether acetates used in production of its Imron paint. DuPont, then, clearly qualifies as a knowledgeable industrial purchaser with respect to bulk chemicals in general and the possible teratogenic effects of glycol ether acetates in particular. There was, thus, no duty on Eastman and Union Carbide as commodity chemical suppliers to DuPont to warn ultimate purchasers of Imron paint, or the employees thereof, as to teratogenic hazards. *Goodbar v. Whitehead Bros.,* 591 F.Supp. at 559.[6]

It is patently clear that DuPont was in a far better position than either of the bulk suppliers to communicate an effective warning to its customers, including the Baltimore City Fire Department, and to their customers' employees, including the plaintiff fire fighters. DuPont manufactured (from various chemicals including the glycol ether acetates supplied by Eastman and Union Carbide), packaged, labelled, and distributed the finished product denominated Imron paint. The facility with which DuPont could communicate an effective labelling warning to its customers is apparent. By comparison, Eastman and Union Carbide supplied in bulk, *via* railroad tank cars and tank trucks, vast amounts of liquid chemicals which were subsequently reprocessed and repackaged by DuPont as Imron paint, rendering these bulk suppliers unable, as a practical matter, to communicate any warning to the ultimate purchasers. Contrary to plaintiffs' assertion, there is simply no question of material fact as to whether Eastman and Union Carbide, as suppliers, reasonably relied on the knowledgeable industrial purchaser DuPont to warn customers like Baltimore City. Paper # 47, at 1; Paper # 46, at 6. The suppliers' apparent reliance upon DuPont to communicate an effective warning to its customers was also clearly reasonable. In short, there was no duty upon either Eastman or Union Carbide to communicate any warning to ultimate purchasers of Imron paint, given that only Dupont was ever in any reasonable position to communicate any effective warning. *See Goodbar v. Whitehead Bros.,* 591 F.Supp. at 566.

For these reasons, the substantive motions of defendants Eastman and Union Carbide for summary judgment on plaintiffs' negligent and strict liability failure to warn claims will be, by separate order, *granted.*

## C.

█ Plaintiffs herein also sued defendants Eastman and Union Carbide for "breach of express and implied warranties of merchantability and fitness of purpose" arising from their alleged failure to warn. The Court finds that there is no genuine dispute of material fact with respect to, and that judgment may be granted as a

---

**6.** Plaintiffs cite *Goodbar* for the proposition that no obligation to warn is placed on the supplier so long as the *danger* related to the product is *clearly known* to the purchaser. Paper # 47, at 2; Paper # 46, at 7–8. They apparently claim that this requirement of *Goodbar* has not been met by defendant suppliers Eastman and Union Carbide here, because all of the documentation refers to the *possible* teratogenic effects of the glycol ether acetates in Imron paint. The word "danger" implies an evil or harm which one may or may not encounter. Therefore, this Court specifically finds that the documentation of possible teratogenic effects of the aforementioned chemical components satisfies any requirement of clearly known danger imposed by *Goodbar.* The Court additionally notes the irony arising from the fact that these plaintiffs, who have based their entire case on a duty to warn of the teratogenic effects of those chemicals, now argue in this context that there was no clearly known danger of teratogenic effects!

matter of law on, the breach of warranty claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the first place, the only viable warranty claim made by plaintiffs herein is breach of the implied warranty of merchantability. No evidence of any express warranty has been advanced by plaintiffs. *Compare* Md.Comm. Law Art. (U.C.C.) § 2-313 *with* §§ 2-314 and 2-315 (1975). Indeed, the making of any express warranty relating to product safety in the bulk supply context appears inconceivable to this Court, and plaintiffs have demonstrated no such warranty. It is also the case that the plaintiffs have advanced no factual or legal support for the existence of any implied warranty of fitness for a particular purpose, U.C.C. § 2-315. An implied warranty of merchantability claim under U.C.C. § 2-314, like the one pending before the Court in the instant case, was asserted in the *Goodbar* case. Judge Kiser stated, simply, that where a skilled purchaser knows or reasonably should be expected to know of the dangerous propensities or characteristics of a product, no implied warranty of merchantability arises under Virginia law, citing Va.Code 8.2-314. Given that DuPont had extensive knowledge of the possible teratogenic effects of the glycol ether acetates supplied by Eastman and Union Carbide, it is likewise the case here that no implied warranty of merchantability arises under Maryland law. The Maryland and Virginia U.C.C. statutes are *in pari materia* in pertinent part. Finally, the question of whether the ultimate user may maintain an action under U.C.C. § 2-318 is, of course, immaterial when no warranty arises or is breached at the point of sale.

For these reasons, the substantive motions of defendants Eastman and Union Carbide for summary judgment on plaintiffs' breach of warranty claims will also be, by separate order, *granted*.

### III.

Defendants Eastman and Union Carbide have moved for summary judgment on the additional ground that plaintiffs' negligence, strict liability, and warranty claims arising from the alleged failure to warn are barred by limitations. Papers # 42 and # 38, at 4-8, respectively. Because the Court has dismissed plaintiffs' claims against defendants Eastman and Union Carbide on other grounds, the statute of limitations defense need not, and will not, be addressed.

### IV.

Also pending before the Court are the motions for protective order submitted by defendants Eastman and Union Carbide. Paper # 45 and Paper # 49. Plaintiffs resist these motions on the ground that the sophisticated user/bulk supplier defense is not available to defendants Eastman and Union Carbide herein. Paper # 48 and Paper # 46. Given the Court's disposition of the claims against defendants Eastman and Union Carbide, based on the sophisticated user/bulk supplier defense, the motions for protective order are *moot*.

### V.

An order embodying the above rulings will be entered separately.