SARA LEE CORPORATION, etc., Conoplex Insurance Company, Ltd.

v.

HOMASOTE COMPANY, Rex Plastics, Inc., BASF Corporation, Atlantic Richfield Company, etc.

Civ. No. B–86–418.

United States District Court, D. Maryland.

Aug. 9, 1989.

James L. Fetterly and Stanley E. Siegel, Minneapolis, Minn., and Robin Page West, Baltimore, Md., for plaintiffs.

A. Douglas Owens and Rodger O. Robertson, Baltimore, Md., for defendant Homasote Co.

E. Charles Dann, Jr. and Kevin M. Soper, Towson, Md., for defendant Rex Plaxtics, Inc.

James E. Gray, David W. Allen and Linda S. Woolf, Baltimore, Md., for defendant BASF Corp.

Larry D. Espel, Minneapolis, Minn., and M. Jennifer Crump and David M. Grove, Baltimore, Md., for defendant Atlantic Richfield Co.

WALTER E. BLACK, Jr., District Judge.

Pending before the Court are Motions for Summary Judgment filed by the four remaining defendants in this case: Rex Plastics, Inc. (Rex Plastics), Atlantic Richfield Company (ARCO), B.A.S.F. Corporation (BASF), and Homasote Company (Homasote). The issues were fully briefed, and the Court had the benefit of oral argument of counsel.

This litigation arises out of a fire on May 16, 1983, at a pickle processing plant in Hurlock, Maryland. In the Amended Complaint, Sara Lee Corporation, to its own use and to the use of Conoplex Insurance Company, Limited, alleges that the products made by each of the four defendants contributed to rapid flame growth and development, causing the fire damage and resulting losses incurred by plaintiffs. Defendants' products allegedly comprised different parts of a ceiling that was remodeled in the manufacturing area of the pickle plant in January of 1981. Plaintiffs allege that a wood-based product made by defendant Homasote was used for the underside of the ceiling. Defendant Rex Plastics allegedly provided a polyethylene film which served as a vapor barrier above the Homasote panels. Defendants ARCO and BASF produce a raw material known generically as expandable polystyrene beads ("EPS beads"). Plaintiffs allege that EPS beads made by one or both of these defendants were sold to Foam Industries, which converted this raw material into EPS board insulation and sold the finished product to Moore's retail hardware store. Plaintiffs further allege that EPS board insulation made by Foam Industries was bought from Moore's and incorporated in the ceiling above the Homasote panels. Plaintiffs state four theories of liability in support of their claims against defendants: strict liability, negligence, intentional failure to warn, and violation of certain reporting rules promulgated by the Consumer Product Safety Commission.

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary

judgment shall be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate when a party fails to sufficiently show the existence of an essential element of its complaint on which it will have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden on the movant can at times be heavy, as the standard for passing on motions for summary judgment is strict. *Clarke v. Montgomery Ward & Co.,* 298 F.2d 346, 348 (4th Cir.1962). If interpretations conflict or reasonable persons might differ, summary judgment is improper. *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979). Nevertheless, summary judgment is appropriate if a reasonable jury could not decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for ruling on a motion for summary judgment is the same as that for a directed verdict: that is, whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.*

When a motion for summary judgment has been made and supported, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The mere existence of a scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *See Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. In the absence of such a minimal showing, the moving party should not be required to undergo the considerable expense of preparing for and participating in a trial. In *Bland v. Norfolk and Southern Railroad Co.,* 406 F.2d 863, 866 (4th Cir.1969), Judge Winter aptly stated:

While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

Defendants ARCO and BASF assert that the bulk supplier/sophisticated user defense shields them from liability for a failure to warn the ultimate user about the dangers of their product and, therefore, are entitled to summary judgment as to Counts I, II and III of the Amended Complaint. The Court agrees. Defendants primarily rely on opinions by Judge Smalkin in *Higgins v. E.I. DuPont de Nemours & Co.,* 671 F.Supp. 1055 (D.Md.1987), *aff'd,* 863 F.2d 1162 (4th Cir.1988) and Judge Kiser in *Goodbar v. Whitehead Bros.,* 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213 (4th Cir. 1985). The Court finds these opinions persuasive and controlling as to the failure to warn claims against ARCO and BASF. In the absence of any controlling Maryland decision, this Court in *Higgins* was confident that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense in a failure to warn claim based on negligence under *Restatement (Second) of Torts* § 388 or on strict liability under *Restatement (Second) of Torts* § 402A. *See Higgins,* 671 F.Supp. at 1059–60 and cases cited therein. Under this defense, a bulk supplier who supplies a dangerous product to a sophisticated purchaser cannot be held liable for not warning the ultimate users of the product of its dangers. The Court stated that "the recognition of the ... defense logically follows from the sense of § 388, as clearly pointed out by Judge Kiser in *Goodbar,* and as recognized by the Fourth Circuit." 671 F.Supp. at 1059. The Court in *Higgins* cited with approval the analysis by Judge Kiser of § 388 in *Goodbar. Id.* at 1058–59. § 388 states:

One who supplies directly or through a third person a chattel for another to use

is subject to liability to those whom the supplier should expect to use the chattel ... if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

As in *Goodbar* and *Higgins*, the application of § 388 to the facts in this case turns upon whether the requirements of Clause (c) have been met. There is a genuine issue of material fact as to Clause (a)—whether ARCO and BASF knew that the EPS beads were dangerous for their intended use, and Clause (b)—whether ARCO and BASF had reason to believe that the owners of the pickle plant would realize the dangers of EPS board insulation. In order to analyze Clause (c), the Court in *Goodbar* looked to Comment n of § 388 entitled "Warnings given to third person," which delineates various factors that must be balanced in determining what precautions the supplier must take to satisfy the Clause (c) requirement of reasonable care including:

(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burden imposed on the supplier by requiring that he directly warn all users.

*Goodbar*, 591 F.Supp. at 557. This comment "recognizes that a balancing of these considerations is necessary in light of the fact that no single set of rules could possibly be advanced that would automatically cover all situations." *Id.* The Court in *Goodbar* went on to state: "Critical in my view is the recognition that '(m)odern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so.' " *Id.*

In *Goodbar*, the Court granted summary judgment in favor of bulk suppliers, who supplied silica sand and silica-containing products to the Lynchburg Foundry, on a negligent failure to warn claim brought by employees of the foundry who allegedly contracted the respiratory disease of silicosis from exposure to these products. The Court held that under Virginia law there is no duty on product suppliers to warn employees of knowledgeable industrial purchasers as to product-related hazards. *Id.* at 559. The Court stated that when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, it is the purchaser and not the supplier that has the duty to guard against the danger to the purchaser's employees. The Court found that the Lynchburg Foundry had extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis, and proper dust controlling methods. *Id.* at 561–65. In addition, the Court held that the suppliers had no duty to warn Foundry employees when the Foundry was the only one in a position to communicate an effective warning to its employees. *Id.* at 566. The Court listed a number of difficulties faced by the suppliers in attempting to warn Foundry employees including:

(1) the identification of the users or those exposed to its products would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force;

(2) the manner in which the sand products are delivered in bulk (i.e., unpackaged railroad car lots or truck);

(3) no written product warnings placed on the railroad cars would ever reach the workers involved in casting or those in the immediate vicinity due to the way the loose sand is unloaded, conveyed, and kept in storage bins until needed;

(4) only the Foundry itself would be in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systematic basis necessary to reduce the risk of silicosis;

(5) the sand suppliers must rely on the Foundry to convey any safety information to its employees; (6) the confusion arising when twelve different suppliers and the Foundry each try to cope with the awesome task of instructing the Foundry workers; and (7) in a commercial setting, it would be totally unrealistic to assume that the suppliers would be able to exert pressure on a large, industrial customer such as the Foundry to allow the suppliers to come in and educate its workers about the hazards of silicosis.

*Id.* at 566.

Following closely the holding and reasoning in *Goodbar*, the Court in *Higgins*, under Maryland law, held that there is no duty on product suppliers that supply their product in bulk to a knowledgeable purchaser to warn the ultimate users of hazards associated with the product. 671 F.Supp. at 1061. The Court stated that this is especially the case when the knowledgeable purchaser is the only one in a position to communicate an effective warning to the ultimate user. *Id.* In *Higgins*, the Baltimore City Fire Department bought Imron paint from DuPont, which manufactured the paint using chemicals supplied by Eastman and Union Carbide. The Court found that Eastman and Union Carbide, which supplied the dangerous chemicals to DuPont, could not be held liable to DuPont's customers, either in strict liability or negligence, for failing to warn the customers of possible teratogenic effects of the chemicals when incorporated into the paint. The Court found it clear from a "plethora of material" that the possible teratogenic effects of the chemicals were equally within the technical knowledge of DuPont, a knowledgeable industrial purchaser of the chemicals, and Eastman and Union Carbide, the bulk suppliers of the chemicals. *Id.* at 1061. DuPont was privy to full knowledge concerning the dangerous effects of the chemicals both from its own independent inquiries as well as from outside sources including the bulk suppliers. *Id.* at 1061–62. In addition, the Court found that DuPont was in a far better position to communicate an effective warn-

ing to its customers than were the bulk suppliers. DuPont manufactured, packaged, labeled, and distributed the finished product. The Court found that the suppliers reasonably relied on DuPont to communicate an effective warning to its customers and, thus, incurred no duty of their own to warn ultimate purchasers of the Imron paint of the dangerous effects of the chemicals. *Id.* at 1062.

Applying these principles to the case at bar, the Court finds that Foam Industries was a knowledgeable purchaser of EPS beads and was in a far better position to communicate an effective warning to the ultimate user of the EPS board insulation. Therefore, the bulk supplier/sophisticated user defense applies to bar liability against ARCO and BASF on plaintiffs' failure to warn claims in Counts I, II, and III of the Amended Complaint.

The EPS beads sold by defendants ARCO and BASF contain pentane gas, which is very volatile. The defendants sell the beads in thousand pound containers to billet molding companies such as Foam Industries, which expand and mold the beads into EPS board insulation, cut the board into uniform pieces, and package, label, and distribute the finished products to retail stores or directly to end users. The final product, EPS board insulation, is combustible and may burn rapidly.

█ The Court finds that Foam Industries was a knowledgeable industrial user of the EPS beads. From 1976 to 1984, George Bonhach was the president and owner of Foam Industries. At the time of the subject sale of EPS board insulation to Moore's hardware store, Bonhach had worked in the plastics industry and specifically in the area of EPS beads and EPS board insulation for well over twenty years. Bonhach gained considerable knowledge concerning the flammability and construction of EPS products while employed at United Cork, BASF, W.R. Grace, Southeastern Foam, and Foam Industries. Bonhach started with United Cork in 1957 as an estimator and salesman of EPS board insulation for cold storage construction

work. At that time, EPS was a brand new product. United Cork made EPS raw material and manufactured EPS board. Bonhach acquired technical knowledge about EPS in order to perform his job as a salesman and later District Manager at United Cork. In 1964, BASF bought out United Cork and Bonhach was employed by BASF as a sales manager for the EPS raw material. At BASF, Bonhach's duties included managing a sales force of 8–10 people, monitoring the manufacture and quality of EPS bead raw material, and participating in the preparation of technical sales and informational brochures. In 1969, Bonhach began working with W.R. Grace, a company that expanded molded board and made various products from the board. He served as general manager of the EPS Foam Products Division and learned more about the flammability characteristics of EPS. While at W.R. Grace, he developed the "polypanel" packaging for the insulation, which became widely used throughout the industry. Bonhach next worked at Southeastern Foam where he purchased EPS raw material from BASF and ARCO. He was exposed to flammability tests carried out by the Society of Plastics Industry through Underwriters Laboratories. In 1976, Bonhach went into business for himself forming a corporation called Foam Industries, which manufactured foam, EPS foam board and related products. By 1982, the company had gross sales of about 10 million dollars.

As president of Foam Industries, Bonhach had access to extensive information about the flammability of EPS. Defendants BASF and ARCO provided and Bonhach received and maintained product literature concerning the flammability characteristics of EPS raw material and EPS board insulation, as well as other information on product uses and applications. Prior to the purchase of the raw materials for the insulation at issue, BASF had advised its customers including Foam Industries that: EPS board insulation must be considered combustible; that EPS board insulation will burn completely when in direct contact with combustible materials; that in order to reduce the chance of igniting the board, the insulation must be separated from the inside of the building by a thermal barrier, which will prevent the penetration of heat and flame for 15 minutes; and that where EPS board insulation is used in an attic space which is entered only infrequently for building maintenance purposes, an ignition barrier should be applied across the surface of the insulation. BASF informed Foam Industries of the results of numerous tests of surface burning characteristics of EPS board performed by independent laboratories such as Underwriters Laboratories and Factory Mutual. Such tests are prerequisites to product approval by various agencies which promulgate building and fire codes. BASF informed Foam Industries that the tests did not reflect how the product would act under actual fire conditions. Full scale corner fire tests were conducted by the Society of Plastic Industries through Underwriters Laboratories. The results of those tests were contained in four reports. Bonhach assisted in developing these tests while at Southeastern Foam and ordered copies of the reports for his new business, Foam Industries. BASF also advised Foam Industries of industry and federal government warning and label requirements. Bonhach was aware, for example, of the 1974 Federal Trade Commission Consent Decree concerning the flammability characteristics and disclosure requirements pertaining to EPS board and knew that Foam Industries was not permitted to advertise the EPS board insulation as "self-extinguishing." Foam Industries also had access to the technical expertise of employees from BASF and ARCO who were assigned to provide technical support to Foam Industries. Since Bonhach had worked at BASF, he knew the people there and availed himself of their expertise from time to time. Bonhach stated that Foam Industries was far better informed about the end use of EPS board than the EPS raw material salesmen because Foam Industries was the expert in the finished products.

Given that Bonhach, who was President of Foam Industries, had substantial experience and knowledge concerning EPS raw

material, EPS board insulation and the EPS industry, and given that BASF and ARCO provided Foam Industries with extensive information relating to the flammability of EPS board insulation, defendants BASF and ARCO reasonably relied upon Foam Industries to pass on warnings about the dangers of EPS board insulation to its ultimate end users, which included the owners of the pickle plant. In addition, the Court finds that Foam Industries was in a far better position to communicate an effective warning to the end users of the EPS board insulation. The difficulties encountered by the bulk supplier in warning the employees of the Foundry, which were enumerated in *Goodbar*, apply equally to BASF and ARCO in the case at bar. *See* 591 F.Supp. at 566. It would be difficult and unduly burdensome for BASF and ARCO to identify, much less educate or train, all the consumers of products containing their EPS beads. The EPS beads were provided in bulk in one thousand pound containers and were reprocessed and repackaged for distribution by Foam Industries; consequently, BASF and ARCO could not feasibly place a warning on the EPS beads that would reach the end user. In *Higgins*, the Court stated that a bulk supplier faces an even more impossible task in communicating a warning to true consumers than it does in communicating a warning to employees of an industrial purchaser as was the case in *Goodbar*. 671 F.Supp. at 1061 n. 4.

At oral argument, plaintiffs devoted much of their time on this issue attempting to distinguish *Higgins* and *Goodbar* based on the alleged fact that BASF and ARCO had developed and marketed to billet molders the technology for molding EPS raw material into EPS board insulation and the strategy for selling the finished product to consumers. By virtue of this involvement, plaintiffs contend that BASF and ARCO incurred an obligation to warn the consumers of the dangers of EPS board insulation. Plaintiffs' argument, which was scarcely mentioned in their brief, misses the mark. The focus of the bulk supplier/sophisticated user defense is not on the knowledge of the raw material suppliers, but rather on the knowledge of the industrial purchaser. The record in this case establishes that Foam Industries knew or should have known at least as much about the dangers of EPS board insulation to the end user as ARCO and BASF. At oral argument, plaintiffs also asserted that Bonhach was not as knowledgeable or sophisticated as his words or background might have suggested. It is clear from the decisions in *Goodbar* and *Higgins* that the bulk supplier/sophisticated user defense uses an objective, rather than a subjective, test in determining the sophistication of the purchaser. The question is whether the bulk suppliers could reasonably rely on the industrial purchaser to recognize the dangers associated with the product and to pass on warnings to end users. If the bulk suppliers of a product have reason to believe that the purchaser of the product recognizes the dangers associated with the product, then it is the responsibility of the purchaser, not the suppliers, to warn against the dangers. *See Goodbar*, 591 F.Supp. at 561. Since BASF and ARCO reasonably relied upon Foam Industries to pass on warnings about the dangers of EPS board to end users of the finished product, these defendants cannot be held liable for failing to warn the owners of the pickle plant, who purchased the EPS board insulation at issue. Accordingly, the Court will grant summary judgment in favor of defendants ARCO and BASF as to Counts I, II, and III of the Amended Complaint.

The Court next addresses defendants' claims for summary judgment as to Count IV of the Amended Complaint. In Count IV, plaintiffs allege that defendants' products are consumer products which present a substantial product hazard of which the defendants knew or should have known, and that defendants failed to inform the Consumer Product Safety Commission of the substantial risk of harm from these products as required by the Consumer Product Safety Act under 15 U.S.C. § 2064(b) (1983) and its implementing regulations found at 16 C.F.R. Part 1115 (1985). Plaintiffs claim that 15 U.S.C. § 2072(a) affords them a private right of

action for violation of the reporting rules in 16 C.F.R. Part 1115, citing in particular the decision by Judge Murray in *Butcher v. Robertshaw Controls Co.*, 550 F.Supp. 692 (D.Md.1981). 15 U.S.C. § 2072(a) states:

Any person who shall sustain injury by reason of any knowing (including willful) violation of a consumer product safety rule, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, shall recover damages sustained, and may, if the Court determines it to be in the interest of justice, recover costs of suit, including reasonable attorneys' fees ... and reasonable expert witnesses' fees....

In *Butcher*, Judge Murray held, in a question of first impression, that the plain meaning of § 2072(a) and the purposes of the Consumer Product Safety Act indicated that Congress intended a private right of action for knowing violations of the reporting rules in 16 C.F.R. Part 1115. Subsequent to *Butcher*, the Eighth Circuit became the first court of appeals to address this issue and held, based on an examination of the statute as a whole, that Congress did not intend a private right of action for violations of the reporting rules set out in 16 C.F.R. Part 1115. *Drake v. Honeywell, Inc.*, 797 F.2d 603, 606 (8th Cir.1986). Since *Drake*, two other circuits have ruled on this issue, and both have held that there is no private right of action for violations of the reporting rules in 16 C.F.R. Part 1115. *Benitez–Allende v. Alcar Aluminio do Brasil, S.A.*, 857 F.2d 26, 34–35 (1st Cir.1988) (following *Drake* for the reasons set forth therein), *cert. denied,* —— U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989); *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 941–44 (7th Cir.1988) (agreeing with the result and much of the reasoning in *Drake* but relying primarily on a causation analysis to bar a private right of action). The Fourth Circuit has not addressed this issue to date. After careful review, this Judge, finding the reasoning in *Drake* persuasive, declines to fol-

low this Court's previous ruling in *Butcher*, holding instead that plaintiffs cannot assert a private right of action against defendants for alleged reporting violations under 15 U.S.C. § 2064(b) or its implementing rules contained in 16 C.F.R. Part 1115. In *Drake*, the court specifically rejected the "plain meaning" construction adopted by *Butcher* and other district courts at the time. 797 F.2d at 606, n. 3 and accompanying text. Noting that § 2072(a) does not apply to statutory violations, the court in *Drake* stated, and this Court agrees, that it would frustrate congressional intent to find a private right of action under the reporting rules when no private right of action exists under the reporting statute itself. *Id.* The Court further agrees with the *Drake* court's analysis of legislative versus interpretive rules and its conclusion that Congress intended the phrase "any other rule issued by the Commission" in § 2072(a) to refer to legislative, not interpretive, rules. The rules in 16 C.F.R. Part 1115 are by their own terms interpretive rules: 16 C.F.R. § 1115.1 states in relevant part that the purpose of Part 1115 is "to set forth the Consumer Product Safety Commission's ... interpretation of the reporting requirements imposed on manufacturers ... by section 15(b) of the Consumer Product Safety Act (CPSA) (15 U.S.C. 2064(b))....." *See also Drake*, 797 F.2d at 607–09. The court in *Drake* lists examples of sections of the Consumer Product Safety Act in which Congress delegated power to the Commission to promulgate legislative rules which, if violated, would give rise to a private cause of action under 15 U.S.C. § 2072(a). 797 F.2d at 608 n. 6. In lieu of restating the Eighth Circuit's entire analysis, the Court follows the holding reached in *Drake* for the reasons more fully set forth therein.

In addition, the Court finds that even if a private right of action existed for violations of the Consumer Product Safety Act's reporting rules, defendants ARCO and BASF could not be held liable because the EPS beads they manufacture are not "consumer products" within the meaning of the Act. 15 U.S.C. § 2064(b) imposes

reporting requirements upon manufacturers of consumer products. The term "consumer product" is defined in the Consumer Product Safety Act in relevant part as follows:

> any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include—
>
> > (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer....

15 U.S.C. § 2052(a)(1). Plaintiffs assert that the EPS beads are component parts of EPS board insulation, which is an article sold to consumers for use in or around permanent or temporary households or residences. Defendants ARCO and BASF concede that the EPS board insulation manufactured from the EPS beads is a consumer product, but argue that Congress did not intend that raw materials sold only to manufacturers and having no direct use or application to consumers be considered as consumer products. The Court agrees. While the term "component part" is not defined in the Consumer Product Safety Act, the Senate Committee explained the reason for including the term: "The definition of 'consumer product' has been broadened to include 'a component' of the product, so that the Agency could regulate just a part of a product, if only such regulation is warranted." Report of the Senate Committee on Labor and Public Welfare, S.Rep. No. 835, 92d Cong., 2d Sess. 7 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin. News 4573, 4579. The House Committee's report states:

> It is not intended that true "industrial products" be included within the ambit of the Product Safety Commission's authority. Thus, your committee has specifically excluded products which are not cus-

tomarily produced or distributed for sale to or use of consumers.

H.R.Rep. No. 1153, 92d Cong., 2d Sess. 27 (1972). The Court finds that EPS beads are not component parts of a consumer product and that Congress did not intend to include raw materials such as the EPS beads within the regulatory authority of the Consumer Product Safety Commission.

As a result of the above rulings, the Court will grant summary judgment in favor of defendants ARCO and BASF as to all counts of the Amended Complaint and in favor of defendants Rex Plastics and Homasote as to Count IV of the Amended Complaint.

 Defendant BASF asserts as an alternative basis for summary judgment that there is no evidence from which a reasonable jury could find that its EPS beads were part of the EPS board insulation sold by Foam Industries to the owners of the pickle plant and incorporated into the ceiling. The Court disagrees and finds that there is an issue of material fact as to whether EPS beads from BASF were present in the EPS board insulation.

 In their Motions for Summary Judgment, defendants BASF, Rex Plastics, and Homasote also assert that plaintiffs assumed the risk of their injuries as a matter of law and, therefore, that defendants are entitled to summary judgment. Defendants argue that plaintiffs assumed the risk of fire by conducting welding and cutting operations within the plant on the day of the fire without properly cleaning the area prior to undertaking those operations, and by failing to conduct an inspection of the area afterwards. In order to prove that plaintiffs assumed the risk, defendants must show that plaintiffs:

1) had knowledge of the risk or danger;

2) appreciated that risk; and

3) voluntarily exposed themselves to it.

*See Hooper v. Mougin,* 263 Md. 630, 635, 284 A.2d 236 (1972) (citation omitted). At oral argument, defendant ARCO on behalf of all defendants stated that no one could determine what caused the fire or where the fire started, and that it was speculation

that the fire started in the ceiling of the manufacturing plant. On the basis of the current record, the Court finds that there is a genuine issue as to whether plaintiffs had knowledge of the risk of the fire, appreciated that risk, and voluntarily exposed themselves to it. Therefore, defendants are not entitled to summary judgment on the basis of plaintiffs' assumption of the risk of their injuries.

In their Motions for Summary Judgment, Rex Plastics and Homasote assert that defendants are entitled to summary judgment against plaintiff Sara Lee because the undisputed material facts establish that Sara Lee was the sole stockholder of Bloch and Guggenheimer, Inc., the owner of the pickle plant at the time of the fire, and, under applicable law, a stockholder may not recover damages for injury to corporate owned assets. Defendants argue further that Bloch and Guggenheimer did not reserve the right to bring this lawsuit when it sold its assets to a foreign corporation in 1984 and, therefore, Bloch and Guggenheimer could not assign such right to Sara Lee. At oral argument, plaintiffs argued initially that these issues had not been raised in the moving papers and should be summarily dismissed. The Court disagrees and rejects this argument. *See* Defendant Rex Plastic's Memorandum in Support of its Motion for Summary Judgment at 6–7. In the alternative, plaintiffs proffered evidence that Bloch and Guggenheimer did retain the right to bring this lawsuit when it sold its assets to a foreign corporation in 1984 and stated that there were factual issues as to whether Sara Lee is the real party in interest. Finally, plaintiffs indicated that pursuant to Rule 17(a) of the Federal Rules of Civil Procedure they are entitled to a reasonable time in order to rectify the situation before the Court dismisses Sara Lee on the ground that it is not the real party in interest. The Court finds the state of the record as to Sara Lee's right to bring this action unclear and, accordingly, will not render a ruling at this time. The Court will be prepared to address this issue further either at the pretrial conference or at the end of plaintiffs' case.

Finally, the Court addresses the issue of punitive damages. At oral argument, plaintiffs stated that, after careful review of the evidence in the record, they dropped their claim of punitive damages against defendant Rex Plastics. In addition, plaintiffs conceded that an insurer is limited to its rights of subrogation and, therefore, that plaintiff Conoplex Insurance Company, as a subrogee of Bloch & Guggenheimer, is not entitled to assert a claim for punitive damages against defendants. Plaintiffs, in the name of Conoplex, are seeking only to recover the amount paid out in claims as a result of the fire. As a result of the plaintiffs' concessions and the Court's rulings in this opinion, the only remaining claim for punitive damages is the claim by plaintiff Sara Lee to its own use against defendant Homasote on Counts I, II and III of the Amended Complaint. Under Maryland law, punitive damages are available in a products liability action based on negligence if the conduct of the defendant is characterized by a wanton or reckless disregard for the rights of others. *American Laundry Machinery Industries v. Horan*, 45 Md.App. 97, 116–17, 412 A.2d 407 (1980) (citation omitted). The Court finds that it is a question of fact as to whether Homasote acted with wanton or reckless disregard of plaintiffs' rights. Plaintiffs have presented sufficient evidence at this stage in the case to raise an issue of material fact as to whether Homasote had substantial knowledge that its product was dangerous and exhibited a gross indifference to the danger. *See id.* at 117, 412 A.2d 407. While precedent in this Court suggests that punitive damages are not available under a theory of strict liability in a products liability action, *see Doe v. Miles Laboratories, Inc., Cutter Laboratories Div.*, 675 F.Supp. 1466, 1481 (D.Md.1987), the Court need not decide that issue at this time. At the end of the plaintiffs' case, after all of the facts have been presented as to defendant Homasote's product and its conduct in this case, the Court will be prepared to rule on the issue of punitive damages as to Counts I, II and III of the Amended Complaint.

For all of the foregoing reasons, the Court will grant the Motions for Summary Judgment filed by defendants ARCO and BASF as to all counts of the Amended Complaint. The Court will grant summary judgment in favor of defendants Rex Plastics and Homasote as to Count IV of the Amended Complaint. Based on plaintiffs' concessions at oral argument, the Court will grant summary judgment in favor of defendant Rex Plastics as to plaintiffs' claims for punitive damages in Counts I, II, and III of the Amended Complaint, and will grant summary judgment in favor of Homasote as to claims by Conoplex Insurance Company for punitive damages in Counts I, II, and III of the Amended Complaint. In all other respects, the Motions for Summary Judgment filed by defendants Rex Plastics and Homasote will be denied. The Court will enter a formal order in accordance with this opinion.