**Daniel L. SINGLETON,
Sandra Singleton**

v.

**MANITOWOC COMPANY, INC.**

**Civ. No. PN–86–2425.**

United States District Court,
D. Maryland.

Dec. 15, 1989.

Bertram M. Goldstein, Dean Kasian, and Goldstein, Weltchek & Associates, Baltimore, Md., for plaintiffs.

Robert K. Nead, and O'Doherty, Nead & Hoffman, Baltimore, Md., for defendant.

## OPINION AND ORDER

NIEMEYER, District Judge.

This product liability case raises issues 1) whether a crane involved in personal injury was negligently or defectively designed, 2) whether superseding intervening events transferred responsibility from the manufacturer to others, and 3) whether the plaintiff's negligence contributed to his own injuries or he assumed the risk of danger.

Daniel Singleton lost four fingers as the result of injuries sustained on June 8, 1983, when his hand was pinched between a crane superstructure and an open toolbox as the crane rotated on its base. He contends that the manufacturer is responsible on theories of strict liability and negligence because the crane's design allowed for a "blind spot" such that the operator could not see around the left side of the superstructure of the crane. He also contends that the manufacturer failed to warn him of the risk of danger created by the "blind spot."

The manufacturer, Manitowoc Company, Inc., filed a motion for summary judgment in which it contends 1) that the blind spot in this case was not a defect and that the manufacturer was not negligent, 2) that liability, if any, was transferred from the manufacturer to Singleton's employer by superseding intervening events, and 3) that Singleton was contributorily negligent or assumed the risk of danger. For the reasons given hereafter, the Court will grant the motion for summary judgment.

## I
### FACTS

Singleton, who was employed as a laborer by Cianbro, Inc. at its job site on the Conowingo dam, was directed by his foreman to place some tools in a toolbox attached to the base of a truck crane shortly before quitting time at 3:30 p.m. on June 8, 1983. The toolbox is alleged to have been located on the left side of the crane which is a "blind spot" that cannot be seen by the operator while operating the crane. As Singleton lifted the lid of the toolbox with one hand, holding the tools in the other, the crane operator, who was also an employee of Cianbro, swung the crane around and Singleton's left hand, which was on the raised lid, was crushed between the lid and the rotating crane superstructure. Singleton suffered injuries and subsequently four fingers on his left hand were amputated.

Singleton and his wife Sandra Singleton have sued Manitowoc Company, Inc., the manufacturer of the crane, in three counts for strict liability, negligence, and loss of consortium as a result of the injuries sustained by Singleton. The claim for loss of consortium depends on the success of the other two claims.

Manitowoc manufactured the Model 2900 truck crane that was involved in the accident and sold it to Ellis Snodgrass, Inc. in April 1966, over seventeen years before the accident. The crane was transferred to Cianbro in 1967 when Cianbro bought the assets of Snodgrass. Although the crane was originally sold by Manitowoc with a small tool cabinet located in the operator's cab, sometime after the sale of the crane by Manitowoc to Snodgrass, another and larger toolbox was installed on the exterior of the crane housing, which is the toolbox involved in the accident. The installation of supplemental toolboxes on a crane's exterior was apparently a common practice in the construction industry. However, there has been no allegation that Manitowoc knew of the installation of the toolbox in this case until the instigation of this action. Moreover, the size, configuration, and location of these supplemental toolboxes were not standard throughout the industry.

At the time of the accident, Singleton had been working for Cianbro with and near similar cranes at Conowingo dam for nine months. Previously he had worked for five years for another company in similar employment. Singleton attended Cianbro's safety meetings that were held every two to three weeks for the nine months preceding the accident. He also confirmed that at the time of the accident, yellow tape had been strung around the perimeter of the crane on its outriggers. Singleton testified in deposition that he knew that the purpose of the yellow tape was to keep people outside of the area when the crane was in operation. Nevertheless, on June 8, 1983, he crossed into the area surrounded by cautionary tape to place his tools in the toolbox affixed to the crane's exterior.

In their papers submitted in opposition to the motion for summary judgment, plaintiffs discuss at length the feasibility of attaching a mirror or mirrors to the crane to minimize the effects of blind spots. They do not show that cranes manufactured in 1966 or at the time of the accident in 1983 had mirrors or that there was a standard or requirement to attach mirrors.

In supplemental papers filed after the hearing on oral argument plaintiffs did direct the attention of the Court to a "Crane Handbook" by D.E. Dickie published by the Construction Safety Association of Ontario, Canada, in 1975. That handbook states, at page 21:

> It is strongly recommended that all mobile cranes be equipped with the following safety features and devices:
>
> \*    \*    \*    \*    \*    \*
>
> —Adequate lighting for night operation, including back-up lights for all mobile units.
> —Wheel chocks on mobile units to block movement on slopes....
> —Rear view mirrors on both sides of mobile equipment that are each at least 100 square inches in area.

While it would appear in context that the rear view mirror referred to there was recommended in connection with driving a

mobile crane, that recommendation was first published in Canada in 1975, nine years after the sale of this crane.

The defendant contends, apparently without dispute, that no crane manufacturer before or since the accident has installed mirrors on the left side of the superstructure of a mobile crane to eliminate the blind spot about which plaintiffs complain. It is also conceded that such mirrors would never eliminate all blind spots, but would at most minimize them.

## II

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court has previously observed: "The defendant in this case has the burden initially of showing his entitlement to a summary judgment. The plaintiff then must come forward with specific facts, by affidavit, deposition testimony or other appropriate method, to demonstrate that there is a genuine issue for trial." *Tucker v. KFC Nat'l Management Co.*, 689 F.Supp. 560, 561 (D.Md.1988) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1988)), *aff'd without opinion* 872 F.2d 419 (4th Cir. 1989). The allegation of *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

Although by order of the Court discovery was completed on May 1, 1989, three months before defendant's motion for summary judgment was filed, upon plaintiffs' request made at oral argument, the Court allowed time for additional filings to permit plaintiffs to attempt to demonstrate that a blind spot is in fact a "zone of danger" of which the defendant was aware or should have been aware. The plaintiffs have provided additional materials, which the Court has considered, and the parties are now satisfied that the record is complete.

## III

### STRICT LIABILITY

Plaintiffs allege that the facts of record justify a finding that Manitowoc is strictly liable for a defective design at the time of the sale because of the existence of a blind spot on the left side of the crane. They argue that because this blind spot was a "zone of danger," the defendant designed and manufactured a product that was unreasonably dangerous. Plaintiffs have conceded that all vehicles and heavy equipment have blind spots to some extent, raising the question as to what blind spots should be eliminated. Nevertheless, they contend that the defendant could easily and economically have installed mirrors to reduce the blind spot on the left side of the crane where the toolbox was later installed by the owner.

To recover on a theory of strict liability in Maryland, a plaintiff must establish that:

1) the plaintiff was the user or consumer of an alleged defective product;

2) the defendant was the seller of the product and at the time of sale was engaged in the business of selling such a product;

3) at the time of sale the product was defective;

4) the product reached the plaintiff without substantial change in the condition in which it was sold;

5) the defect made the product unreasonably dangerous to the plaintiff; and

6) the defect proximately caused plaintiff's injuries.

*See Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976); Restatement (Second) of Torts § 402A (1965).

In its motion for summary judgment the defendant contends that as a matter of law no design defect has been shown and that

the defect that caused Singleton's injuries was created as the result of the toolbox installed later by third persons.

On the issue whether a design defect existed, the plaintiffs argue that the presence of the blind spot, which created a zone of danger, was ipso facto a defect that could have been easily eliminated with mirrors. They state in their supplemental memorandum:

[T]he fact that no crane manufacturer actually installed mirrors in 1966 is irrelevant to the Plaintiffs' claim of defective design....

[I]n a defective design case, *actual* risks of harm [at the time of injury in 1983] determine defectiveness of design, whether or not foreseeable at the time of sale since the reasonableness of the manufacturer's conduct is not a consideration.

The theory of strict liability is to place on persons engaged in the "business of selling" responsibility for *defects* in the products they sell, without regard to whether the defective condition came about innocently or negligently. Although strict liability increases the exposure of sellers to liability, it does not make them insurers of users and consumers. A defect at the time of sale must be shown.

Comment g to § 402A of the Restatement (Second) of Torts describes a defect as "a condition not contemplated by the ultimate consumer," and Comment h continues:

The defective condition may arise not only from harmful ingredients, *not characteristic of the product* itself either as to presence or quality, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packaged. (Emphasis supplied.)

A defect surely cannot be *any* condition that creates risk of harm. Rather it must be an imperfection; there must be a condition of the product by which it does not conform to 1) recognized standards in the design and manufacture of the product, 2) recognized standards imposed by society,

or 3) the reasonable expectations of purchasers of the product at the time the product was sold. Therefore, it does become relevant whether reasonable purchasers of cranes expected them to work differently than the crane that injured the plaintiff, or whether industry or societal standards in 1966 required cranes to be manufactured differently than that involved in this case. Only by looking at factors such as these can a standard be established against which to measure whether the crane in question was defective.

If it is concluded that a design defect existed at the time of sale, the analysis would then of necessity turn to the issue whether the defect created an unreasonable danger. That analysis requires a weighing of the utility of risk inherent in the design against the magnitude of the risk. *See Phipps v. General Motors Corp.,* 278 Md. at 345, 363 A.2d 955; *Banks v. Iron Hustler Corp.,* 59 Md.App. 408, 425–27, 475 A.2d 1243 (1984).

There seems to be no question that at the time that Manitowoc manufactured and sold the crane in 1966, there were no standards that suggested that blind spots could or should be minimized by the installation of mirrors. Indeed, the U.S. government has confronted the issue of safety standards on cranes and has not to this date imposed the standard to install mirrors. *See* Bureau of Labor Standards Proposed Rule Making, Amendment 21 to 29 CFR § 1504.74(c), Fed.Reg. 7611 (June 11, 1965) (not subsequently adopted). Both parties also agree that no manufacturer has or does install mirrors on cranes for the purpose advocated by plaintiffs.

Likewise, there is no evidence that in 1966 a purchaser expected to have mirrors installed. Nothing indicates that Ellis Snodgrass, Inc., the original purchaser, or Cianbro, Inc., the subsequent purchaser, or for that matter any operator expected mirrors as suggested. There is also no evidence that shows that any purchaser or user of the crane considered the absence of mirrors to be a defect.

It is certainly arguable that a defect nevertheless existed because the blind

spots and absence of mirrors created a recognized dangerous condition that the industry simply refused to address for whatever reason. To make this argument, however, it must be shown that at the time of sale an unreasonable danger existed, that it was known to exist, and that it could have been addressed practically. Sellers of cranes in 1966 cannot be judged by standards and technology that existed in 1983, now, or in the future. In the absence of knowledge and perception of a danger, it can hardly be contended that sellers or purchasers would conclude at that time that the crane was defective. For example, it may be recalled that automobiles manufactured before the war had no turn signals, seat belts, padded dashes, and the like. Yet, we cannot say that for any of those reasons they were defective.

■ In this case there is no evidence that in 1966 the defendant, the crane-manufacturing industry, purchasers or users perceived it to be dangerous to manufacture or use a crane without mirrors. If users or consumers had been injured before 1966 because of the blind spots, the number must have been few. The record reveals none. Moreover, even the current incident involving Mr. Singleton would not have happened with a crane in the form in which it was manufactured and sold. Only by the addition of the exterior toolbox did it become possible for this accident to have occurred.

Under any standard or definition of defect, the crane manufactured by Manitowoc and sold to Snodgrass was not defective.

To sustain a claim for strict liability the plaintiff would also have to show that the crane reached Cianbro and Singleton without substantial change in the condition in which it was originally sold by Manitowoc. Not every change, however, defeats liability. To escape liability, it must be demonstrated that the change is a material one by which the causative impact of the original defect no longer survives as a substantial cause of injury. If, after a change is made to a product, the original defect survives as a substantial cause of injury, then the change does not preclude liability under a theory of strict liability. *See* Comments p and q to § 402A, Restatement (Second) of Torts. *Cf.* Restatement (Second) of Torts §§ 440, 442B. *See also Banks v. Iron Hustler Corp.*, 59 Md.App. at 432, 475 A.2d 1243.

Manitowoc contends that the installation of the toolbox constitutes a substantial change that defeats liability. Plaintiffs argue that the installation of toolboxes was foreseeable because it was common in the industry for users to install their own customized toolboxes. The difficulty with that argument is that the user-installed toolboxes were not of uniform size, design or location. The one installed by Snodgrass or Cianbro was affixed to a platform that was welded to the base of the crane. The lid opened upward so as to create a pinch-point at which Singleton injured his hand. Manitowoc did not become aware of this particular toolbox until the litigation was filed.

■ The Court agrees that the change to the crane after its sale in adding the toolbox to its base was a substantial change that would defeat any liability on the part of Manitowoc. Indeed, the change in the crane in this case actually created the pinch-point that injured the plaintiff. In the absence of the toolbox, that "defect," i.e. the pinch-point, did not exist.

Because the plaintiffs have failed to show 1) that the crane was defective when sold by Manitowoc in 1966 and 2) that the product reached Singleton without substantial change in the condition at the time of sale, the Court will grant summary judgment in favor of Manitowoc on the claim based on strict liability.

## IV

### NEGLIGENCE

Plaintiffs also contend that Manitowoc was negligent in its design of the crane by failing to include mirrors to reduce blind spots, particularly where the toolbox was located, and in failing to warn of a dangerous condition.

To succeed in recovery for negligence the plaintiffs must establish: 1) a duty requiring one to conform to a certain standard for the protection of others against foreseeable risks; 2) a failure to conform to the prescribed standard; 3) injury to the plaintiff; and 4) causation. *See Cramer v. Housing Opportunity Comm'n,* 304 Md. 705, 712, 501 A.2d 35 (1985). Thus, in order for plaintiffs to succeed in their negligence claim, they must as a threshold matter identify a duty recognized by law.

A duty is imposed by law to avoid an unreasonable risk of danger which, however, must be determined by balancing the danger and acceptable social risks against utility, expense and practicality. Were all danger to be avoided, there could be no advances in technology. A duty is also imposed by law to warn of dangerous conditions in certain circumstances. *See Higgins v. E.I. DuPont de Nemours, Inc.,* 671 F.Supp. 1055 (D.Md.1987); Restatement (Second) of Torts § 388. Whether the law imposes a duty is a question of law for the court. Only when a duty exists does the factual question arise whether it has been breached. *See Myers v. Montgomery Ward & Co.,* 253 Md. 282, 291, 252 A.2d 855 (1969) (quoting *Walter Brooks Bradley, Inc. v. N.H. Yates & Co.,* 218 Md. 263, 146 A.2d 433 (1958)).

The factual circumstances revealed in the record of this case do not readily demand the recognition of a duty to install mirrors or otherwise eliminate blind spots. Had the toolbox not been installed, this accident would not have happened and the facts of record contribute little to resolving the question whether an unreasonable risk existed by reason of the blind spot alone. As observed above in connection with the discussion whether a defect existed, there is no evidence that in 1966, or even now, a standard exists to eliminate all blind spots. That duty could arise only in the face of a perceived danger. None was perceived in 1966 and the danger involved in this case, i.e. the pinch-point, was brought about by the installation of the toolbox.

The plaintiffs have shown that since the early 1970's (some years after this accident) other accidents did occur under varying circumstances involving the rotation of the crane superstructure. This prompted Manitowoc in 1977 to circulate a new service manual for its cranes providing for warnings to remain clear of the crane when the crane was running. The manual also directed the owners to apply decals on cranes providing warnings both to the operators and to those around the crane while in operation.

Plaintiffs also offered an affidavit of Frank Carter who has operated cranes for some 30 years. He stated that he operated a Manitowoc crane in 1970 on which some other operator had installed a mirror which reduced blind spots, and he himself affixed a mirror to a crane that he operated in 1975. There is no other testimony of their use and acceptance.

■ This record does not support the imposition of a duty to eliminate all blind spots on cranes, or even the particular blind spot in this case where the toolbox was located. To impose that duty would require the imposition of a similar duty with respect to all vehicles, all of which are manufactured, sold and operated with blind spots. Our jurisprudence has not come to that point. *See Mondshour v. General Motors Corp.,* 298 F.Supp. 111 (D.Md. 1969). In *Mondshour* the plaintiff brought an action for personal injuries against the manufacturer of a bus which did not have a right rearview mirror installed on it when manufactured in 1948. The plaintiffs alleged that the mirror would have eliminated the blind spot on the right side of the bus and may have prevented an injury that occurred in 1965. In holding that no duty existed, the court dismissed the action. The bus had been designed in 1948 and had been operated for seventeen years prior to the accident giving rise to the litigation. The court stated: "The reasonableness of defendant's conduct must be judged in light of the circumstances existing at [the time of design], rather than the present." *Id.* at 114. *See also Singleton v. International Harvester Co.,* 685 F.2d 112 (4th Cir.1981).

In this case because there was no defect in the crane when sold in 1966, as the Court has already found, there can be neither a duty to correct a defect that did not exist, nor a duty to warn. Absent a duty, the claim for negligence cannot be sustained.

## V

### SUPERSEDING INTERVENING FACTORS

As additional grounds for its motion, the defendant argues that three intervening factors shift responsibility, if any, from Manitowoc to others, factors that it contends would be superseding intervening causes. The defendant contends that:

1) the installation of the toolbox after sale by some third-party purchaser was a superseding intervening cause of the plaintiff's injuries;

2) the passage of seventeen years between the date of sale by the manufacturer and the injury imposed on subsequent owners the duty to inspect and maintain the crane, and any failure to conform it to current safety standards shifted liability to the subsequent owners; and

3) the owner of the crane, Cianbro, was in a better position to warn and provide safety measures to avoid industrial accidents, and therefore liability, if any, was transferred to it under the sophisticated user doctrine.

A superseding intervening cause is an act or force that intervenes after the conduct of the defendant so as to relieve the defendant of his responsibility for the injuries of the plaintiff. It interrupts the causation of the defendant's conduct and operates to shift liability to the perpetrator of the intervening act or force.

The Restatement of Torts identifies factors to consider in determining whether an intervening force is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; ...

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; ...

Restatement (Second) of Torts § 442. Cf. *Banks v. Iron Hustler Corp.*, 59 Md.App. at 430–31, 475 A.2d 1243.

Although the question of whether a superseding act of a third person will constitute an intervening cause is generally for the trier of fact to determine, " 'when the evidence presented and the logical inferences deducible therefrom admit of but one conclusion' ... the issue [may] become a question of law." *Banks*, 59 Md.App. at 431, 475 A.2d 1243, quoting *Caroline v. Reicher*, 269 Md. 125, 131, 304 A.2d 831 (1973); *Segerman v. Jones*, 256 Md. 109, 259 A.2d 794 (1969).

■ In this case if the toolbox had not been attached to the crane subsequent to its sale, there would have been nothing to trap Singleton's hand against the crane housing. Thus, the attachment of the toolbox to the crane by someone other than Manitowoc permits but one conclusion— that it was a superseding intervening event, relieving Manitowoc of liability.

■ Similarly, following the holding of *Mondshour v. General Motors Corp.*, the passage of seventeen years between the date of sale and the injury with possession of the crane in third parties who had the duties of maintenance, inspection, and conforming it to current safety standards acted as a superseding intervening cause. 298 F.Supp. at 114.

The court in *Mondshour* held that assuming *arguendo* that GM had been negligent in its design of a bus by failing to install a mirror,

[T]he later negligence of [the owner of the bus] in failing to inspect and properly maintain its equipment, including the installation of safety devices to meet changing conditions in the seventeen years since the purchase of that bus,

would be a superseding intervening cause and limit the liability of GM. *Id.* at 114. The facts in *Mondshour* closely parallel those facts in the present case. If the circumstances changed during the period Cianbro owned and operated the crane such that installation of a rearview mirror would have been required, Cianbro's failure to install such a system would operate as a superseding intervening cause of Singleton's injury.

Finally, defendant contends that under the doctrine of "sophisticated user," liability, if any, arising from a failure to warn of a known danger is transferred from defendant to Cianbro.

In *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985), the court held that a supplier of silica sand did not have a duty to warn employees of a foundry of the dangers of contracting silicosis from exposure to the silica sand. Applying the sophisticated user doctrine, the court transferred any duty to warn employees of danger from the supplier to the employer:

> [I]n alleged negligent failure to warn situations such as this litigation, if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger by either warning its employees or otherwise providing the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated.

591 F.Supp. at 560–61. *See also Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417 (D.Md.1989); *Higgins v. E.I. DuPont de Nemours, Inc.*, 671 F.Supp. 1055 (D.Md. 1987).

In *Higgins* the court addressed the applicability of the sophisticated user doctrine in Maryland: "In the absence of any controlling Maryland decision, this Court is confident that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense in a negligent failure to warn case." 671 F.Supp. at 1059. Plaintiffs there brought suit against the manufacturer of paint and the manufacturer's supplier. The court granted summary judgment in favor of the supplier, holding that under Maryland law there is no duty on a bulk product supplier to warn the ultimate users of the hazards of a product when the purchaser is knowledgeable and the purchaser is the only one in a position to communicate an effective warning to the ultimate users. *Id.* at 1061.

More recently in *Sara Lee*, the court again held that a manufacturer was relieved of liability under the sophisticated user doctrine, because the purchaser of the manufacturer's product was a "knowledgeable purchaser of EPS beads and was in a far better position to communicate an effective warning to the ultimate user of the EPS board insulation." 719 F.Supp. at 422. The Court held:

> The focus of the bulk supplier/sophisticated user defense is not on the knowledge of the raw material suppliers, but rather on the knowledge of the industrial purchaser.... The question is whether the bulk suppliers could reasonably rely on the industrial purchaser to recognize the dangers associated with the product and to pass on warnings to end users. If the bulk suppliers of a product have reason to believe that the purchaser of the product recognizes the dangers associated with the product, then it is the responsibility of the purchaser, not the suppliers, to warn against the dangers.

*Id.* at 424.

The principle of relieving the manufacturer from liability where the purchaser is a knowledgeable industrial user extends beyond suppliers of raw materials to suppliers of finished products. In *Marshall v. H.K. Ferguson Co.*, 623 F.2d 882 (4th Cir. 1980), the plaintiff, who was an employee of a brewing facility, brought suit against the manufacturer of a hops conveyor and the designer of the brewing facility for burns he suffered when opening the cleaning flap of the machine. In affirming judg-

ments in favor of the defendants, the Fourth Circuit held that the employees of the brewing facility were at least as technically knowledgeable as the manufacturer of the conveyor and were at least as well informed as the company that designed and constructed the brewing facility. The court stated: "Under these circumstances, we agree with the district court that Ferguson [the designer and constructor of the facility] had the right to rely upon the expertise of the brewery personnel and had no obligation to warn." *Id.* at 887. Similarly, in *Spangler v. Kranco, Inc.*, 481 F.2d 373 (4th Cir.1973), the manufacturer of a crane was not held liable for failure to install a warning device:

> There was no defect in the crane itself nor in it any latent quality which caused [the plaintiff's] injury. True, there was no bell or warning device but the reasonable need for such equipment depended upon the environment in which it was used by [the employer] after it was received in Richmond. Assuming that its use in the construction phase required a warning device, such a hazard was open and obvious to Reynolds and its personnel and the responsibility rested upon them not upon [the manufacturer].

*Id.* at 375. Although the court found additional support in the fact that the employer had provided the specifications for the crane, the opinion did not rest on that ground. *See Weinberger v. Bristol–Myers Co.*, 652 F.Supp. 187 (D.Md.1986) (under the "informed intermediary" doctrine, prescription drug manufacturer had duty to warn only prescribing or treating physician of potential dangers, not consumer). *See also Brooks v. Medtronic, Inc.*, 750 F.2d 1227 (4th Cir.1984) (manufacturer of pacemaker had no duty to warn patient directly).

■ Cianbro was a knowledgeable, industrial user of cranes and Manitowoc could expect it to recognize risks of operation and warn its employees. Indeed, Cianbro did recognize the dangers of the work environment and provided bi-weekly safety meetings to educate its employees. The area around the crane was roped off with yellow tape to prevent passage near or work around the crane during operations. Singleton testified that Cianbro also used "spotters" to keep the area around the crane clear, although no spotter was on duty at the time of Singleton's accident. Cianbro was in a better position to get warnings to the ultimate user of the crane—its employees—and to enforce attendance at safety meetings and adherence to safety policies. If its warnings had been heeded in this case and its policies enforced, the injuries would not have been sustained.

When, as here, a manufacturer provides its product to a knowledgeable, industrial user and it is reasonable to expect the user to pass on warnings to his employees who operate or work with the product, then the manufacturer is relieved of the duty to warn the employees of risks and dangers of which the user could reasonably be expected to be aware. The Court finds those circumstances to exist here and therefore finds that Manitowoc would be relieved of any duty to warn about the dangers of being around a crane in operation.

The sophisticated user doctrine is a defense both to the claim for a negligent failure to warn and to the strict liability claim. As the court in *Higgins* stated: "This Court is similarly confident that the Court of Appeals of Maryland would also recognize the sophisticated user/bulk supplier defense in a failure to warn claim asserted on the ground of strict liability under Restatement (Second) Torts § 402A (1965)." 671 F.Supp. at 1059.

Therefore, as an additional ground to support granting the motion for summary judgment in this case, superseding intervening causes as described above effectively relieved Manitowoc of liability.

## VI

## CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF RISK

The defendant argues that Singleton was contributorily negligent and assumed the risk of the danger that gave rise to his injuries. While contributory negligence

would be a defense to plaintiffs' negligence claim, it is not a defense to a claim based on the theory of strict liability. Plaintiff's assumption of risk, however, would be a defense to both claims. Plaintiffs urge that these issues are questions of fact for the jury.

Contributory negligence and assumption of risk are generally fact bound questions for the jury to resolve, unless the facts of record permit but one inference. *Wright v. Hixon,* 42 Md.App. 448, 454–55, 400 A.2d 1138 (1979); *Banks v. Iron Hustler Corp.,* 59 Md.App. at 434, 475 A.2d 1243. Thus to withdraw the case from the jury, "the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Balto. Transit Co. v. Castranda,* 194 Md. 421, 434, 71 A.2d 442 (1950); *Baltimore & Ohio R.R. v. Plews,* 262 Md. 442, 454, 278 A.2d 287 (1971).

To prevail on the defense of contributory negligence, the defendant must show that Singleton failed to do what an ordinarily prudent person would have done under the same or similar circumstances and that that failure contributed to his own injuries. *Id.* at 459, 278 A.2d 287. To prevail on a defense that Singleton assumed the risk the defendant must show: "1) the plaintiff actually knew and appreciated the particular risk or danger created by the defect; 2) the plaintiff voluntarily encountered the risk while realizing the danger; and 3) the plaintiff's decision to encounter the known risk was unreasonable." *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 597, 495 A.2d 348 (1985); *Sheehan v. Anthony Pools,* 50 Md.App. 614, 626 n. 11, 440 A.2d 1085 (1982), *aff'd* 295 Md. 285, 455 A.2d 434 (1983) (Part III adopted in full).

In this case Singleton admits that he was familiar with the operation of similar cranes and had worked in close proximity to them for over nine months with Cianbro. He attended safety meetings where Cianbro warned its employees about the dangers of standing in close proximity to the cranes. The area around the crane's out-

riggers was segregated by yellow tape and Singleton admits he understood the purpose of the tape was to keep people out of the area. With this knowledge and background Singleton crossed over the yellow tape to approach the toolbox on the crane while the crane was still running. He testified in deposition that he was holding the lid open for approximately thirty seconds before his hand began to get pinched between the lid and the rotating crane housing.

The Court cannot imagine that an ordinarily prudent person would have ignored his training, instincts and common sense in this manner. Singleton literally stepped across the boundaries of prudence and reasonableness when he knowingly entered the taped off area surrounding the crane. He was not ignorant of potential dangers within that area. Although the plaintiffs do not contest that Singleton entered the restricted area with knowledge of the risks, they argue that he did not do so voluntarily, but was rather under the instruction of his supervisor to return tools to the toolbox. Nevertheless, under these facts the only conclusion that can be reached by a reasonable jury would be that Singleton was contributorily negligent.

On the question whether he assumed the risk, the question is closer. Under that defense subjective facts become relevant and there is a dispute whether Singleton appreciated that the pinch-point existed. Surely he was aware of general dangers and acted despite that knowledge. It is a different matter, however, to conclude that he voluntarily assumed a known and specified risk. The Court concludes that this issue would be one for determination by the jury were this case to go to trial. However, because of the other reasons given in this Opinion, summary judgment will be entered in favor of Manitowoc and against the plaintiffs.

Accordingly, it is hereby ORDERED this 15th day of December, 1989, by the United States District Court for the District of Maryland, that:

1) the motion of defendant for summary judgment is granted, and the judgment

shall be entered in favor of Manitowoc Company, Inc. and against Daniel L. and Sandra Singleton;

2) the Clerk of the Court is directed to enter judgment, to mail a copy of this Opinion and Order to all counsel of record, and to close this case.