John E. HOUSAND, et al.

v.

BRA–CON INDUSTRIES, INC.

Civ. No. JFM–88–2551.

United States District Court, D. Maryland.

Nov. 27, 1990.

Daniel Katz, Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Joseph Harlan, Birrane, Harlan & Skarretts, Baltimore, Md., for plaintiffs.

Kevin Soper, Semmes, Bowen & Semmes, Towson, Md., Brian Nash, Montedonico & Mason, Rockville, Md., Bruce Berman, Scott Godshall, Wilmer, Cutler & Pickering, Washington, D.C., Irwin Alterman, Kemp, Klein, Umphrey, Edelman & Beer, P.C., Troy, Mich., for defendant.

## MEMORANDUM

MOTZ, District Judge.

This action is brought by John E. Housand and his wife, Eileen, against Fetz Engineering Company ("Fetz"), Dominion Tool & Die ("Dominion") and International Industrial Contracting Corporation ("IICC").[1] The suit arises out of an accident which occurred on August 27, 1985 at General Motors' plant at Broening Highway in Baltimore, where Housand was formerly employed. Extensive discovery has

---

1. Plaintiffs (to whom I will refer collectively as "Housand") also originally named as defendants DEC Engineering, Inc. and Bra–Con Industries, Inc. In a prior opinion I granted a motion filed by DEC to dismiss for lack of personal jurisdiction. Bra–Con has since filed for bankruptcy, and all proceedings against it have been stayed.

been conducted, and defendants have now moved for summary judgment.

### FACTS

*The Accident Site*

In 1984 General Motors ("GM") installed a new assembly line to construct mini-vans at its Broening Highway plant. The assembly line is divided into sections designated by letters ("A" line, "B" line, etc.). The J line, on which Housand was injured, is shaped like a U. As mini-vans are shuttled along its left side, they are spot welded robotically. They are then lifted by a mechanical arm at the base of the U and moved across an open space. This open space is known as the "transfer area." The area is approximately ten feet in length and four feet in depth. After the mini-vans have been carried across the transfer area, the mechanical arm places them on an accumulator shuttle on the right side of the U.

The mechanical arm travels across the transfer area at a rate of approximately three feet per second. Two red lights in the transfer area turn on as the arm begins to move.[2] The arm works automatically, and because it operates on a "space available" basis, it can be inactive for long periods of time without having been turned off.

There are two control panels in the immediate vicinity of the transfer area, and the J line can be shut down by pushing a stop button on either of them. There is also an emergency stop button in the transfer area itself which causes the J line to shut down when pushed. There are hydraulic pumps running across the floor in the area, and signs are posted outside of it stating "WARNING / AUTOMATIC EQUIPMENT IN USE / KEEP CLEAR." However, this warning did not prevent GM employees from using the transfer area as a passageway, and some time after the J line was installed, GM supervisors ordered that a three-step platform be built "to keep the men from crawling over top of the pumps."

On May 23, 1985, approximately four months before Housand's accident, another GM employee, Benjamin Braun, was struck by the mechanical arm in the transfer area, suffered a heart attack and died. The accident was investigated by the Maryland Office of Occupational Safety and Health ("MOSH"). MOSH found that Braun entered the transfer area while the J line was stopped, that the line re-started while he was still in the area and that he was struck by the mechanical arm and knocked into the spot-weld shuttle. MOSH fined GM for a "serious" violation of occupational safety and health regulations and ordered it to correct the violations immediately. The only remedial actions which GM took were to install a metal barrier outside the transfer area, inhibiting but not barring access, and to construct horizontal bars on either side of the space within.

*The Accident*

Housand had been employed as a booth cleaner with GM for approximately nine years at the time of the August 27, 1985 accident. His job entailed cleaning floors in the body shop where the J line is located. On August 27, 1985, he was working the third shift, from 11:00 p.m. to 7:30 a.m. He arrived at work early, and Willie Roberts, a GM electrician, asked him to clean up a spill in the transfer area. Previously, Housand had always cleaned inside the J line at 3:00 a.m. when the plant was shut down, and he first told Roberts that he "didn't like to go in there because it was dangerous." However, when Roberts told him that he would "watch the line," he agreed to clean the spill during the scheduled work break between 11:00 and 11:23. According to his testimony, he believed that the arm going across the transfer area was shut down during that break.

Accompanied by Roberts, Housand went into the transfer area. Roberts apparently forgot about him and left. Housand was

---

**2.** A "beep-beep sound" may also be made as the arm is set in motion. Although Craig Clauser, Housand's expert witness, has stated that he did not hear such a sound when he observed the arm in operation, Housand testified on deposition that he heard it immediately before the accident.

cleaning up the spill (which he estimated to be approximately five gallons of oil and water) when he heard a "beep-beep" sound. He was sitting on the second step of the platform at the time. As he raised himself up from the step and was turning around, the mechanical arm struck him in the neck and jaw. On deposition Housand stated unequivocally (although his testimony has been contradicted by his own expert witness) that if it were not for the platform which GM had constructed in the transfer area, he could have "gotten out of" the area without being struck by the mechanical arm.

*The Defendants' Roles and Responsibilities*

GM has the duty—under the common law as well as a myriad of federal and state statutes and regulations—to provide a safe working environment for its employees at the Broening Highway plant. In light of this duty the J line was designed, manufactured and installed under the strict supervision of GM personnel. Its engineers were involved at every stage of the process. For example, at times during Fetz's work on the design of some of the J line's machinery, a GM representative was detailed full-time to Fetz's headquarters.

The J line was itself designed by a firm which is not a party to this action, and none of the defendants were given any general responsibility by GM for designing safety mechanisms or warning signs for the line. The scope of the work of each of the defendants was limited and distinct.[3]

(1) Fetz's responsibility was to design certain components on the J line. These included tool no. 40105, the mechanical arm which struck Housand.

(2) Dominion's only role was to manufacture tool no. 40025–01, consisting of four stations on the left hand side of the J line where holes were robotically pierced in the mini-vans. The last of these stations was the location where the mini-van bodies came to rest awaiting passage across the transfer area. Dominion manufactured two shut-down controls for tool no. 40025–01, a lock-out control panel and emergency stop buttons adjacent to each of the four stations. However, it did not manufacture any electric controls or other safety controls for any other portion of the J line.

(3) IICC was the firm which actually installed the J line.

## DISCUSSION

Housand asserts claims for negligence against all three defendants and an additional claim for strict liability against Dominion.[4] Underlying all of his claims is the assertion that the J line is defective in that it should have been designed, manufactured and installed in such a manner that it is automatically rendered inoperative when an individual enters the transfer area.

### I.

■ The initial question presented is whether any of the defendants were under a duty to prevent or remedy the defect which Housand alleges to exist. Under Maryland law—which the parties agree is controlling—that question is one of law to be decided by the court. *See Singleton v.*

---

**3.** In his memorandum opposing Fetz's summary judgment motion, Housand asserts that Fetz engineered and designed the entire J line. However, the discovery responses upon which he relies do not support this assertion, and materials addressed by counsel in two letters (dated September 28, 1990 and October 3, 1990) submitted after the summary judgment hearing established Fetz's more limited design responsibility. In order to complete the record, I am making those letters part of the court file.

Housand likewise asserts in his memorandum opposing Dominion's summary judgment motion that Dominion designed the electrical controls for the entire J line. Again, however, his assertion is unsupported. The only evidence

which Housand cites is Dominion's answer to his sixth interrogatory, and this answer refers only to tool no. 40025–01, not to any other piece of machinery on the J line.

**4.** Housand originally asserted warranty claims against all defendants and strict liability claims against Fetz and IICC as well as Dominion. I have previously dismissed those claims against Fetz and IICC on the ground that Fetz and IICC provided services (rather than goods or products) to which strict liability and warranty theories do not apply. Housand has since conceded that his warranty claims against Dominion are time-barred.

*Manitowoc Co.,* 727 F.Supp. 217, 223 (D.Md.1989); *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 291, 252 A.2d 855, 861 (1969). Of course, my decision must be made against a specific factual background. However, if Housand has not produced sufficient evidence to establish the existence of any duty on the part of the defendants, they are entitled to summary judgment. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).[5]

Housand has retained as an expert witness Craig Clauser, a metallurgist and materials engineer by training. Clauser has submitted an affidavit stating his opinion that all of the defendants should have recognized that the absence of an automatic shut-off in the transfer area was a defect and that they should have brought this defect to GM's attention. This is the only evidence upon which Housand relies to establish the defendants' alleged duty. To a significant extent, Clauser's opinion is based upon inaccurate factual predicates. He had been advised and therefore assumed that Fetz had designed and engineered the entire J line and that Dominion had manufactured all of the electrical controls and shut-offs along the line. (See footnote 4, *supra*). This fact alone is sufficient to vitiate his opinion as to the claims against Fetz and Dominion. However, assuming that he would reach the same conclusion if he knew the more limited roles which Fetz and Dominion had played, his views could not withstand critical scrutiny.

The same is true as to the opinion which he has reached concerning IICC.

On several occasions this court has stated its view that the Maryland courts would recognize the "sophisticated user" doctrine in products liability cases. *See, e.g., Higgins v. E.I. DuPont de Nemours, Inc.,* 671 F.Supp. 1055, 1061 (D.Md.1987), *aff'd,* 863 F.2d 1162 (4th Cir.1988); *Singleton v. Manitowoc Co.,* 727 F.Supp. at 225–26; *Sara Lee Corp. v. Homasote Co.,* 719 F.Supp. 417, 422 (D.Md.1989).[6] This doctrine, derived from § 388 of the *Restatement (Second) of Torts,* insulates from liability a person who supplies a product to a knowledgeable industrial user who has reason to know of any dangerous condition which might be inherent in the product. Although the doctrine is frequently applied in the context of bulk suppliers who allegedly have given inadequate warnings, there is no reason why it is not equally applicable to the designer, manufacturer or installer of a piece of machinery allegedly containing an inadequate safety device. *See Singleton,* 727 F.Supp. at 225–26; *Goodbar v. Whitehead Bros.,* 591 F.Supp. 552, 566 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213 (4th Cir.1985). Of similar import is the so-called "contractor's defense" which insulates from liability a person who manufactures or installs a product in accordance with plans and specifications provided to him by the purchaser. *See, e.g., Lesnefsky v. Fischer & Porter Co.,* 527 F.Supp. 951 (E.D.Pa.1981); *Moon v. Winger Boss Co.,* 205 Neb. 292, 287 N.W.2d 430 (1980); *Restatement (Second) of Torts* § 404, comment a (1965).[7]

---

**5.** Housand characterizes summary judgment as a "drastic remedy." This characterization is inaccurate. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 327, 106 S.Ct. at 2555 ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'")

**6.** The sophisticated user doctrine is commonly referred to as a "defense." The same is true as to the doctrine (discussed in the text, *infra*) relieving from liability an independent contractor who has manufactured or installed a prod-

uct in accordance with plans and specifications provided to him. Although it is perhaps a quibble, I question the accuracy of this characterization. Since both of these doctrines have the effect of negating any duty on the part of the defendant and since the establishment of a duty is one of the elements of a plaintiff's claim, it seems to me that neither doctrine is technically a "defense." However, in the present case the issue is entirely academic since my decision does not rest in any way upon the question of which party has the burden of proof.

**7.** Housand contends that tort principles aside, IICC was required to alert GM to the need for an automatic shut-off device in the transfer area

These doctrines, which are embedded in and reflect the realities of the industrial world, are fully applicable in this case. As stated above, the roles played by the defendants were limited. Fetz merely designed the mechanical arm which struck Housand, Dominion only manufactured the four stations of the tool on the left hand side of the J line and IICC simply installed the line. None of the defendants designed or engineered the J line as a whole or the transfer area in particular. They did all of their work under the watchful eye of GM engineers and in the expectation that GM would fully meet the panoply of its legal duties to provide employees with a safe place to work.

Under the *Restatement* principles a designer or contractor may be held liable if he fails to alert the purchaser to a defect which is open and obvious, and Clauser opines that the absence of an automatic shut-off device in the transfer area was such a defect. This assertion, however, simply constitutes an instance of the all too frequent practice of a forensic witness attempting to usurp the judicial function by talismanic invocation of a legal formula. Clauser's opinion is not substantiated by any independent evidence, and it is dramatically undercut by the fact that GM did not install an automatic shut-off device after the accident leading to Benjamin Braun's death. If the need for such a device was "obvious," clearly GM would have perceived it after one of its employees had been killed and after it had been cited by MOSH for a serious safety violation.

In *Spangler v. Kranco, Inc.*, 481 F.2d 373 (4th Cir.1973), the Fourth Circuit was confronted with a factual situation almost identical to the one presented here. The plaintiff in that case had been "struck by an overhead pendant crane while working as a pipefitter on a platform at a Reynolds Metal Company plant which was then under construction in Richmond." *Id.* at 374. The crane had been manufactured by Kranco, and "it was not equipped with any bells or warning devices to be activated when it was placed in motion." *Id.* The plaintiff sued Kranco under theories of negligence and strict liability. The Fourth Circuit affirmed the trial court's granting of a motion for directed verdict on behalf of Kranco. The court found that the absence of a bell or other warning device "was open and obvious to Reynolds and its personnel and the responsibility [to remedy the problem] rested upon them not upon Kranco." *Id.* at 375. The court perceived no deficiency of design and further found that Kranco was entitled to judgment under "the principle that the products liability rule holding a manufacturer liable does not apply where the product has been manufactured in accordance with the plans and specifications of the purchaser except when such plans are so obviously dangerous that they should not reasonably be followed." *Id.* Although the court was applying Virginia law, it was analyzing *Restatement* principles which are the common source of both Virginia and Maryland law. Thus, the court's rulings are directly pertinent here and mandate issuance of summary judgment on behalf of all the defendants.

## II.

■ The defendants contend that they are entitled to summary judgment on the alternative ground that GM's construction of a platform in the transfer area was a superseding intervening cause of Housand's accident. *Singleton v. Manitowoc Co.*, 727 F.Supp. 217 (D.Md.1989), strongly supports their position. There, the court found that the installation by plaintiff's employer of a tool box at a location within

by virtue of certain provisions in the specifications provided to it by GM. Those specifications stated that "it is expected that ... [all] items will be included to provide a complete, fail-safe system consistent with codes and standard practices" and that IICC would "assume full engineering responsibility for the services to be performed, and will comply with generally accepted architectural and engineering stan-

dards...." Any fair and reasonable reading of these provisions does not lead to the conclusion that they were intended to convert IICC, an installer, into a general safety design engineer but rather that they were intended only to require IICC to perform its installation work in accordance with professional installation standards.

the "blind spot" of a crane manufactured by the defendant was a superseding intervening cause of an accident in which the plaintiff was injured.

Housand seeks to distinguish *Singleton* on two grounds. First, while he concedes that he testified on deposition that he could have avoided being hit by the mechanical arm if the platform constructed by GM had not been present, he points to Clauser's testimony to the effect that his own testimony in that respect was inaccurate. Although I do not consider a party's deposition testimony to be a judicial admission which cannot under any circumstances be contradicted by independent evidence, I am not prepared to find that a genuine issue of fact is created by a conflict between a party's own testimony, based upon his own first-hand perception and years of experience, and a contrary opinion given by an expert witness whom the party has retained and whose training (here, metallurgy and materials engineering) is not directly relevant to the opinion which he gives. *Cf. Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984); *Chesebrough–Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir.), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982).

Second, Housand argues that this case is unlike *Singleton* in that it was the defendants' own fault which resulted in GM constructing the platform in the transfer area. Although this distinction may be sound in principle, it is not supported by the evidence here. There is absolutely no basis in the record to support a contention that Fetz, Dominion or IICC actually created any hazardous condition in the transfer area. At the most they merely failed to perceive the defect which GM had itself created by failing to provide for an auto-matic shut-off device in the transfer area. Such an omission does not provide a sufficient basis for rendering the superseding intervening cause doctrine inapplicable.

### III.

The defendants make two final contentions: (1) that Willie Roberts' failure to remain on the scene to watch over Housand (as he promised to do) constituted a second superseding intervening cause;[8] and (2) that Housand was contributorily negligent as a matter of law. Having ruled that defendants are entitled to summary judgment on other grounds, I need not, of course, reach these questions. However, in order to provide a basis for a cross-appeal (and thus to expedite the proceedings) in the event that Housand appeals from my entry of summary judgment against him, I think it advisable to state that I believe a jury question is presented on those issues.

A separate order granting defendants' motions for summary judgment is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herein, it is this 27th day of November 1990

ORDERED that

1. The motions for summary judgment filed by Fetz Engineering Co., Dominion Tool & Die Co. and International Industrial Contracting Corp. are granted; and

2. Judgment is entered in favor of defendants against plaintiff as to all the claims asserted against them.

---

**8.** Defendants argue that a third superseding intervening cause was GM's failure to take more effective corrective action after the accident in which Benjamin Braun was killed. As indicated in the text, *supra,* I am of the view that (1) GM's continuing duty to provide a safe working environment is a critical factor in negating any alleged duty on the part of the defendants, and (2) GM's failure to install an automatic safety device after the Braun accident undermines any contention that the absence of such a device was an obvious defect which the defendants should have perceived and brought to GM's attention. However, it seems to me that a jury question is presented on the superseding intervening cause issue if, in fact, the defendants' duty to provide for an automatic shut-off device in the first instance has been established (and assuming, of course, that in that event GM's construction of the platform after the Braun accident did not constitute a superseding intervening cause).