CANTIL-SAKAUYE, C. J.,
Concurring and Dissenting.—I agree that substantial evidence supports the jury’s verdict against Special Electric Company, *194 Inc. (Special Electric), and that the judgment of the Court of Appeal should therefore be affirmed. I disagree, however, with the majority’s holding that a supplier of hazardous materials may satisfy its duty to warn end users by relying on an intermediary where the supplier fails to warn the intermediary of the dangers and knows only that the intermediary “should be” rather than “is actually” aware of the dangers.
As discussed below, the record reflects that health hazards of asbestos have long been known, but research concerning the relationship between crocido-lite and mesothelioma did not begin to emerge until the 1960s. Thereafter, studies established that crocidolite is by far the most dangerous form of asbestos, and was the cause of a grossly disproportionate number of mesothe-lioma cases. Special Electric, which sold crocidolite to Johns-Manville Corporation (Johns-Manville), did not warn Johns-Manville or any end users of Johns-Manville’s products of the dangers associated with crocidolite. The victims of mesothelioma are a graphic illustration of the tragedy that may follow the failure to warn of a product’s hazards. Because a requirement that a supplier convey warnings to a direct purchaser imposes only a minimal burden, no policy reason exists to allow suppliers to rely on intermediaries even if the suppliers do not know the intermediaries actually know of the dangers. Neither the cases nor the principles the majority cites support its holding.
According to expert testimony in this case, there were reports in the 1920s linking the breathing of asbestos dust to death. By the end of the 1930s, it was established that asbestos caused asbestosis, or scarring of the lungs, and it was clear in the 1950s that exposure to asbestos caused lung cancer.
In early studies, mesothelioma, a relatively rare cancer, was not distinguished from other lung cancers caused by asbestos, but in 1960, a study was published concerning the incidence of mesothelioma in South Africa, where crocidolite was mined. It was not until the mid- 1960s that researchers began studying whether different types of asbestos carry different risks. According to an expert in this case, subsequent studies reflected that crocidolite caused almost all cases of mesothelioma. One expert opined that crocidolite presents five times the risk of chrysotile asbestos, the type of asbestos mined by Johns-Manville in Quebec, and conceded crocidolite might present a risk as high as 10 times the toxicity of chrysotile. A second expert opined that crocidolite is 500 times as toxic, and testified that others estimated its risk to be 800 times as high. A third expert testified that one day’s exposure to a significant concentration of crocidolite could cause mesothelioma. The risk is borne not only by the individual who encounters crocidolite in the workplace, but also by those who come in contact with the individual’s work clothes; family members unknowingly exposed themselves to this extremely toxic substance by hugging a loved one and laundering work clothes.
*195 As one expert observed, mesothelioma is “a bad way to die.” The expert explained that the malignancy involves the lining of the lung, and will eventually entrap the entire lung, creahng the hghtening effect of a corset by preventing the lung from expanding. The cancer also grows outward into the chest wall where it irritates nerve roots, creahng pain. People with mesothe-lioma live, on average, 12 to 14 months. Chemotherapy may extend their lives a few months, but will not cure the cancer. If a patient survives surgery to remove as much of the lung lining as possible or to remove an entire lung, his or her life expectancy will be about 24 months. Eventually, patients require oxygen 24 hours a day and increasing doses of narcotics to mitigate the pain. In addition, as the cancer consumes muscle mass, patients become increasingly weak, losing the ability to care for themselves and finally requiring care 24 hours a day.
One of the purposes of providing warnings concerning the dangers of products is to enable the consumer or others who might come in contact with the product to choose not to expose themselves to the risks presented. (Rest.3d Torts, Products Liability, § 2, com. i, p. 30.) According to the Centers for Disease Control, during just the seven-year period from 1999 to 2005, mesothelioma was associated with more than 18,000 deaths in the United States. (Centers for Disease Control, Malignant Mesothelioma Mortality— United States, 1999-2005, MMWR Weekly (Apr. 24, 2009) online at <http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5815a3.htm> [as of May 23, 2016].) Presumably, had those victims been warned of the toxicity of crocidolite, most would have chosen not to be exposed to this carcinogen. Due to the failure of participants in the stream of commerce, consumers and others were not able to make a choice to protect themselves and their loved ones from this extremely toxic substance.
In this case, we are called upon to determine how a supplier of a hazardous material may sahsfy its duty to warn those who might be exposed to the hazard, and thereby enable those at risk to take steps to mitigate or entirely avoid the risk. As the majority acknowledges, every seller in the chain of distribution has a duty to warn of known hazards, and in some cases may sahsfy that duty by relying on others to provide adequate warnings. (Maj. opn., ante, at pp. 176-177, 181, 185.) I agree with the majority that the Restatement sets forth the appropriate test for evaluating whether a supplier may rely on an intermediary to warn those who will subsequently encounter the hazard—‘“reasonableness in the circumstances.” (Rest.3d Torts, Products Liability, § 2, com. i, p. 30; see maj. opn., ante, at p. 186.) I disagree, however, with the majority’s view that a supplier may satisfy its duty to warn end users by relying on an intermediary where the supplier knew only that the intermediary should have been aware of the specihc danger. (Maj. opn., ante, at p. 187.)
*196 In support of this standard, the majority relies principally on Johnson v. American Standard, Inc. (2008) 43 Cal.4th 56 [74 Cal.Rptr.3d 108, 179 P.3d 905] (Johnson), in which this court recognized the sophisticated user doctrine.[1] Johnson involved a heating, ventilation, and air-conditioning (HVAC) technician’s claim against a manufacturer of air-conditioning equipment. The technician suffered injuries when he applied heat to air-conditioner pipes, causing residual refrigerant in the pipes to release a harmful gas. HVAC technicians had generally known of this risk for decades, and material safety data sheets, which state regulations require employers to use to train their employees, noted the risk. In addition, the plaintiff had the highest certification available from the Environmental Protection Agency, which allowed him to work on large commercial air-conditioning systems.
Johnson held that ‘“[t]he duty to warn is measured by what is generally known or should have been known to the class of sophisticated users, rather than by the individual plaintiffs subjective knowledge.” (Johnson, supra, 43 Cal.4th at pp. 65-66, italics added.) In the course of explaining why the ‘“should have known” standard applies, Johnson stated that ‘“[i]t would be nearly impossible for a manufacturer to predict or determine whether a given user or member of the sophisticated group actually has knowledge of the dangers because of the infinite number of user idiosyncrasies. For example, given users may have misread their training manuals, failed to study the information in those manuals, or simply forgotten what they were taught. However, individuals who represent that they are trained or are members of a sophisticated group of users are saying to the world that they possess the level of knowledge and skill associated with that class. If they do not actually possess that knowledge and skill, that fact should not give rise to liability on the part of the manufacturer.” {Id. at p. 71, italics added.)
In the course of explaining that the sophisticated user defense applies to both negligence and strict liability claims, Johnson stated that the focus of the defense ‘“is whether the danger in question was so generally known within the trade or profession that a manufacturer should not have been expected to provide a warning specific to the group to which plaintiff belonged.” (Johnson, supra, 43 Cal.4th at p. 72.) Similarly, in the course of discussing how to *197 determine user sophistication, Johnson agreed that “the Court of Appeal ‘correctly understood the defense to eliminate any duty to warn when the expected user population is generally aware of the risk at issue, and correctly rejected the argument that a manufacturer’s duty to warn should turn on the individual plaintiffs actual understanding of the risk. Legal duties must be based on objective general predictions of the anticipated user population’s knowledge, not case-by-case hindsight examinations of the particular plaintiff’s subjective state of mind.’ . . . The timeline focuses on the general population of sophisticated users and conforms to the defense’s purpose to eliminate any duty to warn when the expected user population is generally aware of the risk at issue.” (Id. at pp. 73-74.)
Thus, Johnson’s sophisticated user defense applies to members of a class of individuals who should all be aware of the dangers associated with the defendant’s product, such as all trained and certified technicians. The defense does not apply merely because the defendant had knowledge from which it could infer that the particular purchaser should be aware of the specific danger. Moreover, part of the rationale for the defense is that it would be nearly impossible for the defendant to determine whether a particular member of the sophisticated user group has failed to understand or has forgotten the information he or she, by virtue of training and certification, should know regarding the dangers. In contrast, in the context of a sale to an intermediary, directly providing information to the purchaser should require no more than including warnings with the offer of sale, the sales contract, or on the packaging; the supplier need not attempt to determine whether a member of a sophisticated class with which it has no direct contact lacks the knowledge expected of members of the class. In sum, Johnson’s reasoning does not support the majority’s standard.
The majority also relies on the principle that the law should encourage conduct that is capable of being performed, and asserts that the sophisticated intermediary doctrine serves this end by permitting a supplier to discharge the duty to warn “in a responsible and practical way.” (Maj. opn., ante, at p. 187.) It ignores the fact that the most responsible and practical way to satisfy the first prong of the sophisticated intermediary defense is for a supplier to warn the intermediary of the dangers. Instead, despite the fact that a supplier of dangerous materials has a duty to warn the purchaser, the majority crafts a rule that enables a supplier to avoid both that duty and the duty to warn end users by allowing the supplier to assume its buyer is aware of the risks, based on facts that reflect only that the buyer should be aware of the risks.
There does not appear to be any policy reason to allow a supplier merely to assume a buyer is aware of the risks associated with a product. The *198 appropriate balancing of interests focuses on encouraging safety while avoiding unreasonable burdens on commerce. (See Rest.3d Torts, Products Liability, § 2, com. a, p. 16 [in connection with design and warning defects, ‘“[t]he emphasis is on creating incentives for manufacturers to achieve optimal levels of safety in designing and marketing products”].) Our analysis should consider whether the burden of requiring the supplier to either warn the intermediary or know the intermediary is aware of the risks outweighs the enhancement to safety that may result from such a requirement. Instead, the majority seems to focus on the balancing of competing interests in the context of litigation, stating at the outset of its opinion that the sophisticated intermediary doctrine ‘“balances the competing policies of compensating those injured by dangerous products and encouraging conduct that can feasibly be performed.” (Maj. opn., ante, at p. 177.)
After creating a standard that enables a supplier to shirk its duty to warn of risks associated with its product, the majority emphasizes the duty to warn in its discussion of reasonable reliance on the intermediary. It seems inconsistent, however, to allow a supplier, instead of providing a warning, to assume a buyer is aware of dangers simply if the supplier knows the buyer should be aware, and then to characterize as ‘“significant” to the reasonableness of the supplier’s reliance the fact that everyone has a duty to provide warnings. (Maj. opn., ante, at p. 191.) Under the majority’s approach, if the buyer knows that the next party in the chain of distribution should be aware of the dangers, the buyer may assume that next party knows of the dangers and forgo giving warnings, and so on down the chain. On the contrary, if a supplier does not actually warn its buyer, or at least actually know that the buyer is actually aware of the dangers, it should not be allowed to rely on the duty to warn in establishing reasonable reliance.
In connection with the third factor for assessing reasonable reliance—the feasibility of warning end users—the majority speculates that suppliers of raw materials “likely have no way to identify ultimate product users and no ready means to communicate with them.” (Maj. opn., ante, at p. 191.) It is the defendant’s burden to establish reasonable reliance, including any difficulties in providing warnings to end users, and there is no basis for the court’s factual conclusions on this issue. The most recent case cited in support of this discussion is 15 years old. Advances in information technology over the past two decades may enable suppliers of raw materials to learn the uses to which their products are put and the populations that may be exposed to the hazards associated with the products, and to disseminate warnings to those at risk. We should not suggest to suppliers or the lower courts that the most that can be expected of suppliers of raw materials is that they try to have warnings printed on a product’s label.
*199 Clearly, this case involves grave risks and human suffering far beyond the typical case involving a failure to warn. It illustrates, however, the tragedy that may result from the failure of commercial interests to disseminate information regarding the risks associated with their products. Here, Special Electric peddled crocidolite, the most toxic form of asbestos, without providing warnings to anyone. Its reliance on the fact that Johns-Manville itself mined asbestos and conducted extensive research regarding asbestos demonstrates the superficial bases on which businesses may infer that their buyers should be aware of the special dangers posed by the products. Johns-Manville did operate a chrysotile asbestos mine in Quebec, but according to a trial expert, the rate of mesothelioma among miners and millers of asbestos in Quebec is “very low,” with only about 0.4 percent of all deaths due to mesothelioma. The expert explained that “[cjhrysotile asbestos is cleared rapidly from the lungs and also dissolves in the acid environment of the body.” In contrast, crocidolite contains iron, and therefore does not break down in the body. Crocidolite is available only from Australia or South Africa; Johns-Manville did not mine crocidolite. In addition, although Johns-Manville engaged in research regarding asbestos, the research discussed at trial by a former Johns-Manville employee related to product development.
By allowing suppliers of dangerous materials to rely on general assumptions related to an intermediary’s awareness of dangers to avoid their duty to warn, the majority increases the risk that end users will not receive warnings regarding dangers associated with products they encounter. Because the burden of providing warnings to a direct purchaser is so minimal, the majority’s rule is not justified. Therefore, I dissent from the majority’s holding concerning the first prong of the sophisticated intermediary defense.
Chin, J., concurred.

 The majority also cites two cases in which federal courts attempted to discern what standard other states would adopt. Neither case actually involved a failure to warn. (See Cimino v. Raymark Industries, Inc. (5th Cir. 1998) 151 F.3d 297, 334 [trial court made no finding that the supplier failed to warn the intermediary]; Higgins v. E.I. DuPont de Nemours & Co., Inc. (D.Md. 1987) 671 F.Supp. 1055, 1061-1062 [supplier warned the intermediary].) It also cites a case that requires actual knowledge of the purchaser’s knowledge of the risks. (Cabasug v. Crane Co. (D. Hawaii 2013) 988 FSupp.2d 1216, 1228 [“Defendants cannot take benefit of the sophisticated purchaser defense unless they can establish that they knew that the Navy was aware of the dangers of asbestos and that Defendants reasonably concluded that the Navy would provide warnings to its employees”].)